## BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA ET AL. *v.* GARRETT ET AL.

No. 99–1240.   Argued October 11, 2000—Decided February 21, 2001

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed
a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 374.
BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and
GINSBURG, JJ., joined, *post*, p. 376.

*Jeffrey S. Sutton* argued the cause for petitioners. With
him on the briefs were *Bill Pryor*, Attorney General of Ala-
bama, *Alice Ann Byrne* and *Margaret L. Fleming*, Assistant
Attorneys General, *Gregory G. Katsas*, and *Lisa Huggins*.

*Michael H. Gottesman* argued the cause for respondents.
With him on the brief were *Arlene Mayerson*, *Laurence
Gold*, *Deborah Mattison*, *Sandra Reiss*, *Ira Burnim*, and
*Jennifer Mathis*.

*Solicitor General Waxman* argued the cause for the
United States as *amicus curiae* urging affirmance. With

him on the brief were *Assistant Attorney General Lee, Deputy Solicitor General Underwood, Patricia A. Millett, Jessica Dunsay Silver,* and *Seth M. Galanter.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Audrey J. Anderson, Earl I. Anzai,* Attorney General of Hawaii, *Charles F. Fell,* Senior Deputy Attorney General, and *Nancy Albano,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Alan G. Lance* of Idaho, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Betty D. Montgomery* of Ohio, and *Paul G. Summers* of Tennessee; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* and for the Pacific Legal Foundation by *Anne M. Hayes* and *M. Reed Hopper.*

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Mike Hatch,* Attorney General of Minnesota, *Alan I. Gilbert,* Chief Deputy Attorney General, and *W. Karl Hansen,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Janet Napolitano* of Arizona, *Richard Blumenthal* of Connecticut, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *A. B. "Ben" Chandler III* of Kentucky, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Heidi Heitkamp* of North Dakota, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the American Association on Mental Retardation et al. by *James W. Ellis, Michael B. Browde,* and *Christian G. Fritz;* for the American Association of People with Disabilities et al. by *John Townsend Rich;* for the American Bar Association by *Robert Lewin, James A. Shifren,* and *Claude G. Szyfer;* for the American Cancer Society by *Daniel G. Jarcho, Michael J. Haungs, William J. Dalton,* and *Mary P. Rouvelas;* for the Lambda Legal Defense & Education Fund, Inc., et al. by *Catherine A. Hanssens* and *David S. Buckel;* for the National Association of Protection and Advocacy Systems et al. by *Mark E. Haddad, Jacqueline G. Cooper,* and *Sharon Masling;* for the National Council on Disability by *Robert L. Burgdorf, Jr.;* for Self-Advocates Becoming Empowered et al. by *Thomas K. Gilhool, Michael Churchill, Barbara Ransom,* and *Max Lapertosa;* for the Voice of the Retarded et al. by *William J. Burke* and *Tamie Hopp;* for Senator Robert Dole et al. by *Chai R. Feldblum;* and for Law Professors by *Leo G. Rydzewski.*

Briefs of *amici curiae* were filed for the Association of State Correctional Administrators by *Marci A. Hamilton;* for the Coalition for Local Sovereignty by *Kenneth B. Clark;* for the National Employment Lawyers Association et al. by *Daniel F. Goldstein, C. Christopher Brown,* and *Merl H. Wayman;* for Paralyzed Veterans of America et al. by *Ted G. Dane*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We decide here whether employees of the State of Alabama may recover money damages by reason of the State's failure to comply with the provisions of Title I of the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 330, 42 U. S. C. §§ 12111–12117.[1] We hold that such suits are barred by the Eleventh Amendment.

The ADA prohibits certain employers, including the States, from "discriminat[ing] against a qualified individual

---

and *Eve Hill;* for the Southern Poverty Law Center by *Pamela L. Sumners* and *Elizabeth J. Hubertz;* and for Morton Horwitz et al. by *Kenneth W. Brothers, Elizabeth B. McCallum,* and *Claudia Center.* A. Stephen Hut, Jr., filed a statement by former President George H. W. Bush as *amicus curiae.*

[1] Respondents' complaints in the United States District Court alleged violations of both Title I and Title II of the ADA, and petitioners' "Question Presented" can be read to apply to both sections. See Brief for Petitioners i; Brief for United States I. Though the briefs of the parties discuss both sections in their constitutional arguments, no party has briefed the question whether Title II of the ADA, dealing with the "services, programs, or activities of a public entity," 42 U. S. C. § 12132, is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject. See, *e. g., Russello* v. *United States,* 464 U. S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks omitted)). The Courts of Appeals are divided on this issue, compare *Zimmerman* v. *Oregon Dept. of Justice,* 170 F. 3d 1169 (CA9 1999), with *Bledsoe* v. *Palm Beach Cty. Soil & Water Conservation Dist.,* 133 F. 3d 816 (CA11 1998). We are not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question. To the extent the Court granted certiorari on the question whether respondents may sue their state employers for damages under Title II of the ADA, see this Court's Rule 24.1(a), that portion of the writ is dismissed as improvidently granted. See *The Monrosa* v. *Carbon Black Export, Inc.,* 359 U. S. 180, 184 (1959).

with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." §§ 12112(a), 12111(2), (5), (7). To this end, the Act requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." § 12112(b)(5)(A).

> " '[R]easonable accommodation' may include—
>
> "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." § 12111(9).

The Act also prohibits employers from "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." § 12112(b)(3)(A).

The Act defines "disability" to include "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2). A disabled individual is otherwise "qualified" if he or she, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8).

Respondent Patricia Garrett, a registered nurse, was employed as the Director of Nursing, OB/Gyn/Neonatal Services, for the University of Alabama in Birmingham Hospital. See App. 31, 38. In 1994, Garrett was diagnosed with breast cancer and subsequently underwent a lumpectomy, radiation treatment, and chemotherapy. See id., at 38. Garrett's treatments required her to take substantial leave from work. Upon returning to work in July 1995, Garrett's supervisor informed Garrett that she would have to give up her Director position. See id., at 39. Garrett then applied for and received a transfer to another, lower paying position as a nurse manager. See ibid.

Respondent Milton Ash worked as a security officer for the Alabama Department of Youth Services (Department). See id., at 8. Upon commencing this employment, Ash informed the Department that he suffered from chronic asthma and that his doctor recommended he avoid carbon monoxide and cigarette smoke, and Ash requested that the Department modify his duties to minimize his exposure to these substances. See ibid. Ash was later diagnosed with sleep apnea and requested, again pursuant to his doctor's recommendation, that he be reassigned to daytime shifts to accommodate his condition. See id., at 9. Ultimately, the Department granted none of the requested relief. See id., at 8–9. Shortly after Ash filed a discrimination claim with the Equal Employment Opportunity Commission, he noticed that his performance evaluations were lower than those he had received on previous occasions. See id., at 9.

Garrett and Ash filed separate lawsuits in the District Court, both seeking money damages under the ADA.[2] Petitioners moved for summary judgment, claiming that the ADA exceeds Congress' authority to abrogate the State's Eleventh Amendment immunity. See 989 F. Supp. 1409, 1410 (ND Ala. 1998). In a single opinion disposing of both

---

[2] Garrett raised other claims, but those are not presently before the Court.

cases, the District Court agreed with petitioners' position and granted their motions for summary judgment. See *id.*, at 1410, 1412. The cases were consolidated on appeal to the Eleventh Circuit. The Court of Appeals reversed, 193 F. 3d 1214 (1999), adhering to its intervening decision in *Kimel* v. *State Bd. of Regents*, 139 F. 3d 1426, 1433 (CA11 1998), aff'd, 528 U. S. 62 (2000), that the ADA validly abrogates the States' Eleventh Amendment immunity.

We granted certiorari, 529 U. S. 1065 (2000), to resolve a split among the Courts of Appeals on the question whether an individual may sue a State for money damages in federal court under the ADA.

I

The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States. See *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 72–73 (2000); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 669–670 (1999); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 54 (1996); *Hans* v. *Louisiana*, 134 U. S. 1, 15 (1890). The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court. See *Kimel, supra*, at 73.

We have recognized, however, that Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and "act[s] pursuant to a valid grant of constitutional authority." 528 U. S., at 73. The

first of these requirements is not in dispute here. See 42 U. S. C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter"). The question, then, is whether Congress acted within its constitutional authority by subjecting the States to suits in federal court for money damages under the ADA.

Congress may not, of course, base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I. See *Kimel, supra,* at 79 ("Under our firmly established precedent then, if the [Age Discrimination in Employment Act of 1967] rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers"); *Seminole Tribe, supra,* at 72–73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction"); *College Savings Bank, supra,* at 672; *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 636 (1999); *Alden* v. *Maine,* 527 U. S. 706, 730–733 (1999). In *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), however, we held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Id.,* at 456 (citation omitted). As a result, we concluded, Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power. See *ibid.* Our cases have adhered to this proposition. See, *e. g., Kimel, supra,* at 80. Accordingly, the ADA can apply to the States only to the extent that the statute is appropriate § 5 legislation.[3]

___

[3] It is clear that Congress intended to invoke § 5 as one of its bases for enacting the ADA. See 42 U. S. C. § 12101(b)(4).

Section 1 of the Fourteenth Amendment provides, in relevant part:

> "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in § 1 by enacting "appropriate legislation." See *City of Boerne* v. *Flores*, 521 U. S. 507, 536 (1997). Congress is not limited to mere legislative repetition of this Court's constitutional jurisprudence. "Rather, Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel, supra,* at 81; *City of Boerne, supra,* at 536.

*City of Boerne* also confirmed, however, the long-settled principle that it is the responsibility of this Court, not Congress, to define the substance of constitutional guarantees. 521 U. S., at 519–524. Accordingly, § 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.,* at 520.

## II

The first step in applying these now familiar principles is to identify with some precision the scope of the constitutional right at issue. Here, that inquiry requires us to examine the limitations § 1 of the Fourteenth Amendment places upon States' treatment of the disabled. As we did last Term in *Kimel,* see 528 U. S., at 83, we look to our prior decisions under the Equal Protection Clause dealing with this issue.

In *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985), we considered an equal protection challenge to a city ordinance requiring a special use permit for the operation of a group home for the mentally retarded. The specific question before us was whether the Court of Appeals had erred by holding that mental retardation qualified as a "quasi-suspect" classification under our equal protection jurisprudence. *Id.*, at 435. We answered that question in the affirmative, concluding instead that such legislation incurs only the minimum "rational-basis" review applicable to general social and economic legislation.[4] *Id.*, at 446. In a statement that today seems quite prescient, we explained that

> "if the large and amorphous class of the mentally retarded were deemed quasi-suspect for the reasons given by the Court of Appeals, it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. One need mention in this respect only the aging, the disabled, the mentally ill, and the infirm. We are reluctant to set out on that course, and we decline to do so." *Id.*, at 445–446.

Under rational-basis review, where a group possesses "distinguishing characteristics relevant to interests the State has the authority to implement," a State's decision

---

[4] Applying the basic principles of rationality review, *Cleburne* struck down the city ordinance in question. 473 U. S., at 447–450. The Court's reasoning was that the city's purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects. Although the group home for the mentally retarded was required to obtain a special use permit, apartment houses, other multiple-family dwellings, retirement homes, nursing homes, sanitariums, hospitals, boarding houses, fraternity and sorority houses, and dormitories were not subject to the ordinance. See *ibid.*

to act on the basis of those differences does not give rise to a constitutional violation. *Id.,* at 441. "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller* v. *Doe,* 509 U. S. 312, 320 (1993) (citing *Nordlinger* v. *Hahn,* 505 U. S. 1 (1992); *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976) *(per curiam)).* Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative " 'any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Heller, supra,* at 320 (quoting *FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 313 (1993)).

JUSTICE BREYER suggests that *Cleburne* stands for the broad proposition that state decisionmaking reflecting "negative attitudes" or "fear" necessarily runs afoul of the Fourteenth Amendment. See *post,* at 382 (dissenting opinion) (quoting *Cleburne,* 473 U. S., at 448). Although such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make. As we noted in *Cleburne:* "[M]ere negative attitudes, or fear, *unsubstantiated by factors which are properly cognizable* in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently . . . ." *Id.,* at 448 (emphases added). This language, read in context, simply states the unremarkable and widely acknowledged tenet of this Court's equal protection jurisprudence that state action subject to rational-basis scrutiny does not violate the Fourteenth Amendment when it "rationally furthers the purpose identified by the State." *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976) *(per curiam).*

Thus, the result of *Cleburne* is that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. They could quite hardheadedly—

and perhaps hardheartedly—hold to job-qualification requirements which do not make allowance for the disabled. If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause.[5]

## III

Once we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional employment discrimination by the States against the disabled. Just as § 1 of the Fourteenth Amendment applies only to actions committed "under color of state law," Congress' § 5 authority is appropriately exercised only in response to state transgressions. See *Florida Prepaid*, 527 U. S., at 640 ("It is this conduct then—unremedied patent infringement by the States—that must give rise to the Fourteenth Amendment violation that Congress sought to redress in the Patent Remedy Act"); *Kimel*, 528 U. S., at 89 ("Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation"). The legislative record of the ADA, however, simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.

Respondents contend that the inquiry as to unconstitutional discrimination should extend not only to States themselves, but to units of local governments, such as cities and counties. All of these, they say, are "state actors" for

---

[5] It is worth noting that by the time that Congress enacted the ADA in 1990, every State in the Union had enacted such measures. At least one Member of Congress remarked that "this is probably one of the few times where the States are so far out in front of the Federal Government, it's not funny." Hearing on Discrimination Against Cancer Victims and the Handicapped before the Subcommittee on Employment Opportunities of the House Committee on Education and Labor, 100th Cong., 1st Sess., 5 (1987). A number of these provisions, however, did not go as far as the ADA did in requiring accommodation.

purposes of the Fourteenth Amendment. Brief for Respondents 8. This is quite true, but the Eleventh Amendment does not extend its immunity to units of local government. See *Lincoln County v. Luning*, 133 U. S. 529, 530 (1890). These entities are subject to private claims for damages under the ADA without Congress' ever having to rely on § 5 of the Fourteenth Amendment to render them so. It would make no sense to consider constitutional violations on their part, as well as by the States themselves, when only the States are the beneficiaries of the Eleventh Amendment.

Congress made a general finding in the ADA that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U. S. C. § 12101(a)(2). The record assembled by Congress includes many instances to support such a finding. But the great majority of these incidents do not deal with the activities of States.

Respondents in their brief cite half a dozen examples from the record that did involve States. A department head at the University of North Carolina refused to hire an applicant for the position of health administrator because he was blind; similarly, a student at a state university in South Dakota was denied an opportunity to practice teach because the dean at that time was convinced that blind people could not teach in public schools. A microfilmer at the Kansas Department of Transportation was fired because he had epilepsy; deaf workers at the University of Oklahoma were paid a lower salary than those who could hear. The Indiana State Personnel Office informed a woman with a concealed disability that she should not disclose it if she wished to obtain employment.[6]

---

[6] The record does show that some States, adopting the tenets of the eugenics movement of the early part of this century, required extreme measures such as sterilization of persons suffering from hereditary mental disease. These laws were upheld against constitutional attack 70 years ago in *Buck v. Bell*, 274 U. S. 200 (1927). But there is no indication that

Several of these incidents undoubtedly evidence an unwillingness on the part of state officials to make the sort of accommodations for 'the disabled required by the ADA. Whether they were irrational under our decision in *Cleburne* is more debatable, particularly when the incident is described out of context. But even if it were to be determined that each incident upon fuller examination showed unconstitutional action on the part of the State, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based. See *Kimel, supra,* at 89–91; *City of Boerne,* 521 U. S., at 530–531. Congress, in enacting the ADA, found that "some 43,000,000 Americans have one or more physical or mental disabilities." 42 U. S. C. § 12101(a)(1). In 1990, the States alone employed more than 4.5 million people. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 338 (119th ed. 1999) (Table 534). It is telling, we think, that given these large numbers, Congress assembled only such minimal evidence of unconstitutional state discrimination in employment against the disabled.

JUSTICE BREYER maintains that Congress applied Title I of the ADA to the States in response to a host of incidents representing unconstitutional state discrimination in employment against persons with disabilities. A close review of the relevant materials, however, undercuts that conclusion. JUSTICE BREYER's Appendix C consists not of legislative findings, but of unexamined, anecdotal accounts of "adverse, disparate treatment by state officials." *Post,* at 379. Of course, as we have already explained, "adverse, disparate treatment" often does not amount to a constitutional violation where rational-basis scrutiny applies. These accounts, moreover, were submitted not directly to Congress but to the Task Force on the Rights and Empowerment of

any State had persisted in requiring such harsh measures as of 1990 when the ADA was adopted.

Americans with Disabilities, which made no findings on the subject of state discrimination in employment.[7] See the Task Force's Report entitled From ADA to Empowerment (Oct. 12, 1990). And, had Congress truly understood this information as reflecting a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings. There is none. See 42 U. S. C. § 12101. Although JUSTICE BREYER would infer from Congress' general conclusions regarding societal discrimination against the disabled that the States had likewise participated in such action, *post*, at 378, the House and Senate committee reports on the ADA flatly contradict this assertion. After describing the evidence presented to the Senate Committee on Labor and Human Resources and its subcommittee (including the Task Force Report upon which the dissent relies), the Committee's Report reached, among others, the following conclusion: "Discrimination still persists in such critical areas as *employment in the private sector*, public accommodations, public services, transportation, and telecommunications." S. Rep. No. 101–116, p. 6 (1989) (emphasis added). The House Committee on Education and Labor, addressing the ADA's employment provisions, reached the same conclusion: "[A]fter extensive review and analysis over a number of Congressional sessions, . . . there exists a compelling need to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of *employment in the private sector*, public accommodations, public services, transporta-

---

[7] Only a small fraction of the anecdotes JUSTICE BREYER identifies in his Appendix C relate to state discrimination against the disabled in employment. At most, somewhere around 50 of these allegations describe conduct that could conceivably amount to constitutional violations by the States, and most of them are so general and brief that no firm conclusion can be drawn. The overwhelming majority of these accounts pertain to alleged discrimination by the States in the provision of public services and public accommodations, which areas are addressed in Titles II and III of the ADA.

tion, and telecommunications." H. R. Rep. No. 101–485, pt. 2, p. 28 (1990) (emphasis added). Thus, not only is the inference JUSTICE BREYER draws unwarranted, but there is also strong evidence that Congress' failure to mention States in its legislative findings addressing discrimination in employment reflects that body's judgment that no pattern of unconstitutional state action had been documented.

Even were it possible to squeeze out of these examples a pattern of unconstitutional discrimination by the States, the rights and remedies created by the ADA against the States would raise the same sort of concerns as to congruence and proportionality as were found in *City of Boerne, supra.* For example, whereas it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities, the ADA requires employers to "mak[e] existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U. S. C. §§ 12112(5)(B), 12111(9). The ADA does except employers from the "reasonable accommodatio[n]" requirement where the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." § 12112(b)(5)(A). However, even with this exception, the accommodation duty far exceeds what is constitutionally required in that it makes unlawful a range of alternative responses that would be reasonable but would fall short of imposing an "undue burden" upon the employer. The Act also makes it the employer's duty to prove that it would suffer such a burden, instead of requiring (as the Constitution does) that the complaining party negate reasonable bases for the employer's decision. See *ibid.*

The ADA also forbids "utilizing standards, criteria, or methods of administration" that disparately impact the disabled, without regard to whether such conduct has a rational basis. § 12112(b)(3)(A). Although disparate impact may be

relevant evidence of racial discrimination, see *Washington v. Davis*, 426 U. S. 229, 239 (1976), such evidence alone is insufficient even where the Fourteenth Amendment subjects state action to strict scrutiny. See, *e. g., ibid.* ("[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact").

The ADA's constitutional shortcomings are apparent when the Act is compared to Congress' efforts in the Voting Rights Act of 1965 to respond to a serious pattern of constitutional violations. In *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966), we considered whether the Voting Rights Act was "appropriate" legislation to enforce the Fifteenth Amendment's protection against racial discrimination in voting. Concluding that it was a valid exercise of Congress' enforcement power under §2 of the Fifteenth Amendment,[8] we noted that "[b]efore enacting the measure, Congress explored with great care the problem of racial discrimination in voting." *Id.*, at 308.

In that Act, Congress documented a marked pattern of unconstitutional action by the States. State officials, Congress found, routinely applied voting tests in order to exclude African-American citizens from registering to vote. See *id.*, at 312. Congress also determined that litigation had proved ineffective and that there persisted an otherwise inexplicable 50-percentage-point gap in the registration of white and African-American voters in some States. See *id.*, at 313. Congress' response was to promulgate in the Voting Rights Act a detailed but limited remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment in those areas of the Nation where abundant evidence of States' systematic denial of those rights was identified.

---

[8] Section 2 of the Fifteenth Amendment is virtually identical to §5 of the Fourteenth Amendment.

The contrast between this kind of evidence, and the evidence that Congress considered in the present case, is stark. Congressional enactment of the ADA represents its judgment that there should be a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U. S. C. § 12101(b)(1). Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. Those requirements are not met here, and to uphold the Act's application to the States would allow Congress to rewrite the Fourteenth Amendment law laid down by this Court in *Cleburne*.[9] Section 5 does not so broadly enlarge congressional authority. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring.

Prejudice, we are beginning to understand, rises not from malice or hostile animus alone. It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves. Quite apart from any historical documentation,

---

[9] Our holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under *Ex parte Young*, 209 U. S. 123 (1908). In addition, state laws protecting the rights of persons with disabilities in employment and other aspects of life provide independent avenues of redress. See n. 5, *supra*.

knowledge of our own human instincts teaches that persons who find it difficult to perform routine functions by reason of some mental or physical impairment might at first seem unsettling to us, unless we are guided by the better angels of our nature. There can be little doubt, then, that persons with mental or physical impairments are confronted with prejudice which can stem from indifference or insecurity as well as from malicious ill will.

One of the undoubted achievements of statutes designed to assist those with impairments is that citizens have an incentive, flowing from a legal duty, to develop a better understanding, a more decent perspective, for accepting persons with impairments or disabilities into the larger society. The law works this way because the law can be a teacher. So I do not doubt that the Americans with Disabilities Act of 1990 will be a milestone on the path to a more decent, tolerant, progressive society.

It is a question of quite a different order, however, to say that the States in their official capacities, the States as governmental entities, must be held in violation of the Constitution on the assumption that they embody the misconceived or malicious perceptions of some of their citizens. It is a most serious charge to say a State has engaged in a pattern or practice designed to deny its citizens the equal protection of the laws, particularly where the accusation is based not on hostility but instead on the failure to act or the omission to remedy. States can, and do, stand apart from the citizenry. States act as neutral entities, ready to take instruction and to enact laws when their citizens so demand. The failure of a State to revise policies now seen as incorrect under a new understanding of proper policy does not always constitute the purposeful and intentional action required to make out a violation of the Equal Protection Clause. See *Washington* v. *Davis,* 426 U. S. 229 (1976).

For the reasons explained by the Court, an equal protection violation has not been shown with respect to the several States in this case. If the States had been trans-

gressing the Fourteenth Amendment by their mistreatment or lack of concern for those with impairments, one would have expected to find in decisions of the courts of the States and also the courts of the United States extensive litigation and discussion of the constitutional violations. This confirming judicial documentation does not exist. That there is a new awareness, a new consciousness, a new commitment to better treatment of those disadvantaged by mental or physical impairments does not establish that an absence of state statutory correctives was a constitutional violation.

It must be noted, moreover, that what is in question is not whether the Congress, acting pursuant to a power granted to it by the Constitution, can compel the States to act. What is involved is only the question whether the States can be subjected to liability in suits brought not by the Federal Government (to which the States have consented, see *Alden* v. *Maine,* 527 U. S. 706, 755 (1999)), but by private persons seeking to collect moneys from the state treasury without the consent of the State. The predicate for money damages against an unconsenting State in suits brought by private persons must be a federal statute enacted upon the documentation of patterns of constitutional violations committed by the State in its official capacity. That predicate, for reasons discussed here and in the decision of the Court, has not been established. With these observations, I join the Court's opinion.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

Reviewing the congressional record as if it were an administrative agency record, the Court holds the statutory provision before us, 42 U. S. C. § 12202, unconstitutional. The Court concludes that Congress assembled insufficient evidence of unconstitutional discrimination, *ante,* at 370, that Congress improperly attempted to "rewrite" the law we established in *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432 (1985), *ante,* at 374, and that the law is not suffi-

ciently tailored to address unconstitutional discrimination, *ante*, at 372–373.

Section 5, however, grants Congress the "power to enforce, by appropriate legislation," the Fourteenth Amendment's equal protection guarantee. U. S. Const., Amdt. 14, § 5. As the Court recognizes, state discrimination in employment against persons with disabilities might "'run afoul of the Equal Protection Clause'" where there is no "'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Ante*, at 367 (quoting *Heller* v. *Doe*, 509 U. S. 312, 320 (1993)). See also *Cleburne* v. *Cleburne Living Center, Inc., supra*, at 440 (stating that the Court will sustain a classification if it is "rationally related to a legitimate state interest"). In my view, Congress reasonably could have concluded that the remedy before us constitutes an "appropriate" way to enforce this basic equal protection requirement. And that is all the Constitution requires.

## I

The Court says that its primary problem with this statutory provision is one of legislative evidence. It says that "Congress assembled only . . . minimal evidence of unconstitutional state discrimination in employment." *Ante*, at 370. In fact, Congress compiled a vast legislative record documenting "'massive, society-wide discrimination'" against persons with disabilities. S. Rep. No. 101–116, pp. 8–9 (1989) (quoting testimony of Justin Dart, chairperson of the Task Force on the Rights and Empowerment of Americans with Disabilities). In addition to the information presented at 13 congressional hearings (see Appendix A, *infra*), and its own prior experience gathered over 40 years during which it contemplated and enacted considerable similar legislation (see Appendix B, *infra*), Congress created a special task force to assess the need for comprehensive legislation. That task force held hearings in every State, attended by more than 30,000 people, including thousands who had experienced discrimination first hand. See From ADA to Em-

powerment, Task Force on the Rights and Empowerment of Americans with Disabilities 16 (Oct. 12, 1990) (hereinafter Task Force Report). The task force hearings, Congress' own hearings, and an analysis of "census data, national polls, and other studies" led Congress to conclude that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U. S. C. § 12101(a)(6). As to employment, Congress found that "[t]wo-thirds of all disabled Americans between the age of 16 and 64 [were] not working at all," even though a large majority wanted to, and were able to, work productively. S. Rep. No. 101–116, at 9. And Congress found that this discrimination flowed in significant part from "stereotypic assumptions" as well as "purposeful unequal treatment." 42 U. S. C. § 12101(a)(7).

The powerful evidence of discriminatory treatment throughout society in general, including discrimination by private persons and local governments, implicates state governments as well, for state agencies form part of that same larger society. There is no particular reason to believe that they are immune from the "stereotypic assumptions" and pattern of "purposeful unequal treatment" that Congress found prevalent. The Court claims that it "make[s] no sense" to take into consideration constitutional violations committed by local governments. *Ante*, at 369. But the substantive obligation that the Equal Protection Clause creates applies to state and local governmental entities alike. *E. g., Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989). Local governments often work closely with, and under the supervision of, state officials, and in general, state and local government employers are similarly situated. Nor is determining whether an apparently "local" entity is entitled to Eleventh Amendment immunity as simple as the majority suggests—it often requires a " 'detailed examination of the relevant provisions of [state] law.' " *Regents of Univ. of Cal.*

v. *Doe*, 519 U. S. 425, 430, n. 6 (1997) (quoting *Moor* v. *County of Alameda*, 411 U. S. 693, 719–721 (1973)).

In any event, there is no need to rest solely upon evidence of discrimination by local governments or general societal discrimination. There are roughly 300 examples of discrimination by state governments themselves in the legislative record. See, *e. g.*, Appendix C, *infra*. I fail to see how this evidence "fall[s] far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based." *Ante*, at 370.

The congressionally appointed task force collected numerous specific examples, provided by persons with disabilities themselves, of adverse, disparate treatment by state officials. They reveal, not what the Court describes as "half a dozen" instances of discrimination, *ante*, at 369, but hundreds of instances of adverse treatment at the hands of state officials— instances in which a person with a disability found it impossible to obtain a state job, to retain state employment, to use the public transportation that was readily available to others in order to get to work, or to obtain a public education, which is often a prerequisite to obtaining employment. State-imposed barriers also frequently made it difficult or impossible for people to vote, to enter a public building, to access important government services, such as calling for emergency assistance, and to find a place to live due to a pattern of irrational zoning decisions similar to the discrimination that we held unconstitutional in *Cleburne*, 473 U. S., at 448. See Appendix C, *infra*.

As the Court notes, those who presented instances of discrimination rarely provided additional, independent evidence sufficient to prove in court that, in each instance, the discrimination they suffered lacked justification from a judicial standpoint. *Ante*, at 370 (stating that instances of discrimination are "described out of context"). Perhaps this explains the Court's view that there is "minimal evidence of unconstitutional state discrimination." *Ibid.* But a leg-

islature is not a court of law. And Congress, unlike courts, must, and does, routinely draw general conclusions—for example, of likely motive or of likely relationship to legitimate need—from anecdotal and opinion-based evidence of this kind, particularly when the evidence lacks strong refutation. See Task Force Report 16, 20 (task force "met many times with significant representatives of groups opposed to [the] ADA," and as to the general public, although the task force received "about 2,000 letters" in support of the ADA, there was only "one letter in opposition"); S. Rep. No. 101–116, at 10 (summarizing testimony that many reasonable accommodations cost "less than $50," and the expense of others, such as hiring employees who can interpret for the deaf, is "frequently exaggerated"). In reviewing § 5 legislation, we have never required the sort of extensive investigation of each piece of evidence that the Court appears to contemplate. Compare *ante*, at 370–371, with *Katzenbach* v. *Morgan*, 384 U. S. 641, 652–656 (1966) (asking whether Congress' likely conclusions were reasonable, not whether there was adequate evidentiary support in the record). Nor has the Court traditionally required Congress to make findings as to state discrimination, or to break down the record evidence, category by category. Compare *ante*, at 371–372 (noting statements in two congressional Reports that mentioned state discrimination in public services and transportation but not in employment), with *Morgan, supra,* at 654 (considering what Congress "might" have concluded); 384 U. S., at 652 (holding that likely discrimination against Puerto Ricans in areas other than voting supported statute abolishing literacy test as qualification for voting).

Regardless, Congress expressly found substantial unjustified discrimination against persons with disabilities. 42 U. S. C. § 12101(9) (finding a pattern of "*unnecessary* discrimination and prejudice" that "costs the United States billions of dollars in *unnecessary* expenses resulting from dependency and nonproductivity" (emphasis added)). See also 2 Legislative History of the Americans with Disabilities

Act (Leg. Hist.) (Committee Print compiled for the House Committee on Education and Labor), Ser. No. 102–B, p. 1620 (1990) (testimony of Arlene B. Mayerson) (describing "unjustifiable and discriminatory loss of job opportunities"); *id.*, at 1623 (citing study showing " 'strong evidence that employers' fears of low performance among disabled workers are unjustified' "). Moreover, it found that such discrimination typically reflects "stereotypic assumptions" or "purposeful unequal treatment." 42 U. S. C. § 12101(7). See also 2 Leg. Hist. 1622 (testimony of Arlene B. Mayerson) ("Outmoded stereotypes whether manifested in medical or other job 'requirements' that are unrelated to the successful performance of the job, or in decisions based on the generalized perceptions of supervisors and hiring personnel, have excluded many disabled people from jobs for which they are qualified"). In making these findings, Congress followed our decision in *Cleburne*, which established that not only discrimination against persons with disabilities that rests upon " 'a bare . . . desire to harm a politically unpopular group,' " 473 U. S., at 447 (quoting *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 534 (1973) (omission in *Cleburne*)), violates the Fourteenth Amendment, but also discrimination that rests solely upon "negative attitude[s]," "fea[r]," 473 U. S., at 448, or "irrational prejudice," *id.*, at 450. Adverse treatment that rests upon such motives is unjustified discrimination in *Cleburne*'s terms.

The evidence in the legislative record bears out Congress' finding that the adverse treatment of persons with disabilities was often arbitrary or invidious in this sense, and thus unjustified. For example, one study that was before Congress revealed that "most . . . governmental agencies in [one State] discriminated in hiring against job applicants for an average period of five years after treatment for cancer," based in part on coworkers' misguided belief that "cancer is contagious." 2 Leg. Hist. 1619–1620 (testimony of Arlene B. Mayerson). A school inexplicably refused to exempt a deaf teacher, who taught at a school for the deaf, from a

"listening skills" requirement. Government's Lodging 1503. A State refused to hire a blind employee as director of an agency for the blind—even though he was the most qualified applicant. *Id.*, at 974. Certain state agencies apparently had general policies against hiring or promoting persons with disabilities. *Id.*, at 1159, 1577. A zoo turned away children with Downs Syndrome "because [the zookeeper] feared they would upset the chimpanzees." S. Rep. No. 101–116, at 7. There were reports of numerous zoning decisions based upon "negative attitudes" or "fear," *Cleburne, supra,* at 448, such as a zoning board that denied a permit for an obviously pretextual reason after hearing arguments that a facility would house "'deviants'" who needed "'room to roam,'" Government's Lodging 1068. A complete listing of the hundreds of examples of discrimination by state and local governments that were submitted to the task force is set forth in Appendix C, *infra.* Congress could have reasonably believed that these examples represented signs of a widespread problem of unconstitutional discrimination.

## II

The Court's failure to find sufficient evidentiary support may well rest upon its decision to hold Congress to a strict, judicially created evidentiary standard, particularly in respect to lack of justification. JUSTICE KENNEDY's empirical conclusion—which rejects that of Congress—rests heavily upon his failure to find "extensive litigation and discussion of the constitutional violations," in *"the courts* of the United States." *Ante,* at 376 (concurring opinion) (emphasis added). And the Court itself points out that, when economic or social legislation is challenged in court as irrational, hence unconstitutional, the "burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Ante,* at 367 (internal quotation marks omitted). Or as Justice Brandeis, writing for the Court, put the matter many years ago, "'if any state of facts reasonably can be conceived that

would sustain'" challenged legislation, then "'there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing . . . that the action is arbitrary.'" *Pacific States Box & Basket Co.* v. *White*, 296 U. S. 176, 185 (1935) (quoting *Borden's Farm Products Co.* v. *Baldwin*, 293 U. S. 194, 209 (1934)). Imposing this special "burden" upon Congress, the Court fails to find in the legislative record sufficient indication that Congress has "negative[d]" the presumption that state action is rationally related to a legitimate objective. *Ante*, at 367.

The problem with the Court's approach is that neither the "burden of proof" that favors States nor any other rule of restraint applicable to *judges* applies to *Congress* when it exercises its § 5 power. "Limitations stemming from the nature of the judicial process . . . have no application to Congress." *Oregon* v. *Mitchell*, 400 U. S. 112, 248 (1970) (Brennan, White, and Marshall, JJ., concurring in part and dissenting in part). Rational-basis review—with its presumptions favoring constitutionality—is "a paradigm of *judicial* restraint." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 314 (1993) (emphasis added). And the Congress of the United States is not a lower court.

Indeed, the Court in *Cleburne* drew this very institutional distinction. We emphasized that "courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices." 473 U. S., at 441. Our invocation of judicial deference and respect for Congress was based on the fact that "[§ ]5 of the [Fourteenth] Amendment empowers *Congress* to enforce [the equal protection] mandate." *Id.*, at 439 (emphasis added). Indeed, we made clear that the absence of a contrary congressional finding was critical to our decision to apply mere rational-basis review to disability discrimination claims—a "congressional direction" to apply a more stringent standard would have been "controlling." *Ibid.* See also *Washington* v. *Davis*, 426 U. S. 229, 248

(1976) (refusing to invalidate a law based on the Equal Protection Clause because a disparate-impact standard "should await legislative prescription"). Cf. *Mitchell, supra,* at 284 (Stewart, J., concurring in part and dissenting in part) ("Congress may paint with a much broader brush than may this Court, which must confine itself to the judicial function of deciding individual cases and controversies upon individual records"). In short, the Court's claim that "to uphold the Act's application to the States would allow Congress to rewrite the Fourteenth Amendment law laid down by this Court in *Cleburne," ante,* at 374, is repudiated by *Cleburne* itself.

There is simply no reason to require Congress, seeking to determine facts relevant to the exercise of its §5 authority, to adopt rules or presumptions that reflect a court's institutional limitations. Unlike courts, Congress can readily gather facts from across the Nation, assess the magnitude of a problem, and more easily find an appropriate remedy. Cf. *Cleburne, supra,* at 442–443 (addressing the problems of the "large and diversified group" of persons with disabilities "is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary"). Unlike courts, Congress directly reflects public attitudes and beliefs, enabling Congress better to understand where, and to what extent, refusals to accommodate a disability amount to behavior that is callous or unreasonable to the point of lacking constitutional justification. Unlike judges, Members of Congress can directly obtain information from constituents who have firsthand experience with discrimination and related issues.

Moreover, unlike judges, Members of Congress are elected. When the Court has applied the majority's burden of proof rule, it has explained that we, *i. e.,* the courts, do not "'sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations.'" *Heller,* 509 U. S., at 319

(quoting *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976) *(per curiam)).* To apply a rule designed to restrict courts as if it restricted Congress' legislative power is to stand the underlying principle—a principle of judicial restraint— on its head. But without the use of this burden of proof rule or some other unusually stringent standard of review, it is difficult to see how the Court can find the legislative record here inadequate. Read with a reasonably favorable eye, the record indicates that state governments subjected those with disabilities to seriously adverse, disparate treatment. And Congress could have found, in a significant number of instances, that this treatment violated the substantive principles of justification—shorn of their judicial-restraint-related presumptions—that this Court recognized in *Cleburne.*

## III

The Court argues in the alternative that the statute's damages remedy is not "congruent" with and "proportional" to the equal protection problem that Congress found. *Ante,* at 374 (citing *City of Boerne* v. *Flores,* 521 U. S. 507, 520 (1997)). The Court suggests that the Act's "reasonable accommodation" requirement, 42 U. S. C. § 12112(b)(5)(A), and disparate-impact standard, § 12112(b)(3)(A), "far excee[d] what is constitutionally required." *Ante,* at 372. But we have upheld disparate-impact standards in contexts where they were not "constitutionally required." Compare *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 432 (1971), with *Washington, supra,* at 239, and *City of Rome* v. *United States,* 446 U. S. 156, 172–173 (1980), with *Mobile* v. *Bolden,* 446 U. S. 55, 62 (1980) (plurality opinion).

And what is wrong with a remedy that, in response to unreasonable employer behavior, requires an employer to make accommodations that are reasonable? Of course, what is "reasonable" in the statutory sense and what is "unreasonable" in the constitutional sense might differ. In other words, the requirement may exceed what is necessary to

avoid a constitutional violation. But it is just that power—the power to require more than the minimum—that §5 grants to Congress, as this Court has repeatedly confirmed. As long ago as 1880, the Court wrote that §5 "brought within the domain of congressional power" whatever "tends to enforce submission" to its "prohibitions" and "to secure to all persons . . . the equal protection of the laws." *Ex parte Virginia,* 100 U. S. 339, 346 (1880). More recently, the Court added that §5's "draftsmen sought to grant to Congress, by a specific provision applicable to the Fourteenth Amendment, the same broad powers expressed in the Necessary and Proper Clause, Art. I, §8, cl. 18." *Morgan,* 384 U. S., at 650 (citing *McCulloch* v. *Maryland,* 4 Wheat. 316, 421 (1819)).

In keeping with these principles, the Court has said that "[i]t is not for us to review the congressional resolution of . . . the various conflicting considerations—the risk or pervasiveness of the discrimination in governmental services . . . , the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected." 384 U. S., at 653. "It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Ibid.* See also *South Carolina* v. *Katzenbach,* 383 U. S. 301, 324 (1966) (interpreting the similarly worded Enforcement Clause of the Fifteenth Amendment to permit Congress to use "any rational means to effectuate the constitutional prohibition"). Nothing in the words "reasonable accommodation" suggests that the requirement has no "tend[ency] to enforce" the Equal Protection Clause, *Ex parte Virginia, supra,* at 346, that it is an irrational way to achieve the objective, *Katzenbach, supra,* at 324, that it would fall outside the scope of the Necessary and Proper Clause, *Morgan, supra,* at 650, or that it somehow otherwise exceeds the bounds of the "appropriate," U. S. Const., Amdt. 14, §5.

The Court's more recent cases have professed to follow the longstanding principle of deference to Congress. See *Kimel*

v. *Florida Bd. of Regents,* 528 U. S. 62, 81 (2000) ("Congress' §5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment." Rather, Congress can prohibit a "somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text"); *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 639 (1999) ("'Congress must have wide latitude'") (quoting *City of Boerne, supra,* at 519–520); *City of Boerne, supra,* at 528 (reaffirming *Morgan*); 521 U. S., at 536 (Congress' "conclusions are entitled to much deference"). And even today, the Court purports to apply, not to depart from, these standards. *Ante,* at 365. But the Court's analysis and ultimate conclusion deprive its declarations of practical significance. The Court 'sounds the word of promise to the ear but breaks it to the hope.'

## IV

The Court's harsh review of Congress' use of its §5 power is reminiscent of the similar (now-discredited) limitation that it once imposed upon Congress' Commerce Clause power. Compare *Carter* v. *Carter Coal Co.,* 298 U. S. 238 (1936), with *United States* v. *Darby,* 312 U. S. 100, 123 (1941) (rejecting *Carter Coal's* rationale). I could understand the legal basis for such review were we judging a statute that discriminated against those of a particular race or gender, see *United States* v. *Virginia,* 518 U. S. 515 (1996), or a statute that threatened a basic constitutionally protected liberty such as free speech, see *Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997); see also Post & Siegel, Equal Protection by Law: Federal Antidiscrimination Legislation After *Morrison* and *Kimel,* 110 Yale L. J. 441, 477 (2000) (stating that the Court's recent review of §5 legislation appears to approach strict scrutiny); 1 L. Tribe, American Constitutional Law §5–16, p. 959 (3d ed. 2000) (same). The legislation before us, however, does not discriminate against anyone, nor does it pose any threat to basic liberty. And it is diffi-

cult to understand why the Court, which applies "minimum 'rational-basis' review" to statutes that *burden* persons with disabilities, *ante*, at 366, subjects to far stricter scrutiny a statute that seeks to *help* those same individuals.

I recognize nonetheless that this statute imposes a burden upon States in that it removes their Eleventh Amendment protection from suit, thereby subjecting them to potential monetary liability. Rules for interpreting § 5 that would provide States with special protection, however, run counter to the very object of the Fourteenth Amendment. By its terms, that Amendment prohibits *States* from denying their citizens equal protection of the laws. U. S. Const., Amdt. 14, § 1. Hence "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.' Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome*, 446 U. S., at 179. See also *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976); *Ex parte Virginia*, *supra*, at 345. And, ironically, the greater the obstacle the Eleventh Amendment poses to the creation by Congress of the kind of remedy at issue here—the decentralized remedy of private damages actions—the more Congress, seeking to cure important national problems, such as the problem of disability discrimination before us, will have to rely on more uniform remedies, such as federal standards and court injunctions, 42 U. S. C. § 12188(a)(2), which are sometimes draconian and typically more intrusive. See *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 704–705 (1999) (BREYER, J., dissenting). Cf. *ante*, at 374, n. 9. For these reasons, I doubt that today's decision serves any constitutionally based federalism interest.

The Court, through its evidentiary demands, its nondeferential review, and its failure to distinguish between judicial and legislative constitutional competencies, improperly invades a power that the Constitution assigns to Con-

gress. *Morgan*, 384 U. S., at 648, n. 7 (The "sponsors and supporters of the [Fourteenth] Amendment were primarily interested in augmenting the power of Congress"). Its decision saps § 5 of independent force, effectively "confin[ing] the legislative power . . . to the insignificant role of abrogating only those state laws that the judicial branch [is] prepared to adjudge unconstitutional." *Id.*, at 648–649. Whether the Commerce Clause does or does not enable Congress to enact this provision, see, *e. g.*, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 100–185 (1996) (SOUTER, J., joined by GINSBURG and BREYER, JJ., dissenting); *College Savings Bank, supra*, at 699–700 (BREYER, J., dissenting), in my view, § 5 gives Congress the necessary authority.

For the reasons stated, I respectfully dissent.

## APPENDIX A TO OPINION OF BREYER, J.

Congressional hearings on the Americans with Disabilities Act

Americans with Disabilities Act of 1989: Hearings on H. R. 2273 before the House Committee on the Judiciary and the Subcommittee on Civil and Constitutional Rights, 101st Cong., 1st Sess. (1989).

Americans with Disabilities Act: Hearing on H. R. 2273 and S. 933 before the Subcommittee on Transportation and Hazardous Materials of the House Committee on Energy and Commerce, 101st Cong., 1st Sess. (1990).

Americans with Disabilities Act: Hearings on H. R. 2273 before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 101st Cong., 1st Sess. (1990).

Americans with Disabilities: Telecommunications Relay Services, Hearing on Title V of H. R. 2273 before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 101st Cong., 1st Sess. (1990).

Americans with Disabilities Act of 1989: Hearing on H. R. 2273 before the Subcommittee on Select Education of the

House Committee on Education and Labor, 101st Cong., 1st Sess. (1989).

Field Hearing on Americans with Disabilities Act: Hearing before the Subcommittee on Select Education of the House Committee on Education and Labor, 101st Cong., 1st Sess. (1989).

Hearing on H. R. 2273, The Americans with Disabilities Act of 1989: Joint Hearing before the Subcommittee on Select Education and Employment Opportunities of the House Committee on Education and Labor, 101st Cong., 1st Sess. (July 18 & Sept. 13, 1989) (two hearings).

Oversight Hearing on H. R. 4498, Americans with Disabilities Act of 1988: Hearing before the Subcommittee on Select Education of the House Committee on Education and Labor, 100th Cong., 2d Sess. (1989).

Americans with Disabilities Act: Hearing before the House Committee on Small Business, 101st Cong., 2d Sess. (1990); Americans with Disabilities Act of 1989: Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess. (1989) (May 1989 Hearings).

Americans with Disabilities Act of 1988: Joint Hearing on S. 2345 before the Subcommittee on the Handicapped of the Senate Committee on Labor and Human Resources and the Subcommittee on Select Education of the House Committee on Education and Labor, 100th Cong., 2d Sess. (1989).

## APPENDIX B TO OPINION OF BREYER, J.

Disability discrimination laws enacted by Congress prior to the Americans with Disabilities Act

Act of June 10, 1948, ch. 434, 62 Stat. 351

Architectural Barriers Act of 1968, 42 U. S. C. § 4151 *et seq.*

Rehabilitation Act of 1973, 29 U. S. C. § 701 *et seq.*

Education of the Handicapped Act, Pub. L. 91–230, Title VI, 84 Stat. 175 (reenacted in 1990 as the Individuals with Disabilities Education Act, 20 U. S. C. § 1400 *et seq.*)

Developmental Disabilities Assistance and Bill of Rights Act, 42 U. S. C. § 6000 *et seq.*

Voting Accessibility for the Elderly and Handicapped Act, 42 U. S. C. § 1973ee *et seq.*

Air Carrier Access Act of 1986, 49 U. S. C. § 41705

Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U. S. C. § 10801 *et seq.*

Fair Housing Amendments Act of 1988, 42 U. S. C. § 3604.

## APPENDIX C TO OPINION OF BREYER, J.

Submissions made by individuals to the Task Force on Rights and Empowerment of Americans with Disabilities. See the Government's Lodging (available in Clerk of Court's case file).

### ALABAMA
*Page No.*

00002    discrimination against the mentally ill in city zoning process

00003    inaccessible exercise equipment at University of Alabama

00004    school failed to train teachers how to work with students with learning disabilities

00005    courts failed to provide interpretive services for deaf people

00006    lack of accessible police and court services for deaf people

00007    inaccessible public transportation

00008    child denied public education because of cerebral palsy

00009    inaccessible public transportation, which prevented persons with disabilities from getting to work

00010  inaccessible public buildings and services; inaccessible transportation

00011  inaccessible public schools; inaccessible public transportation

00013  inaccessible public schools; inaccessible public transportation

00014  failure to enforce building codes requiring access for persons with disabilities

00015  inaccessible courthouse

00017  lack of instructions for use of voting machine by blind people; inaccessible restrooms in newly renovated State House

00021  inaccessible public transportation

00023  inaccessible public transportation

00024  failure to enforce state and local laws protecting persons with disabilities

00025  schools failed to provide an adequate education for children with disabilities

00026  inaccessible public transportation

00027  man denied vocational rehabilitation services based on his cerebral palsy; inaccessible public transportation

00031  vocational rehabilitation agency failed to provide services for schizophrenics; zoning discrimination against group homes

00032  school failed to provide an adequate education

00033  school failed to provide an adequate education

## ALASKA
*Page No.*

00038  school placed child with cerebral palsy in special education classes

00041  inaccessible restrooms in state legislature information office

00042  inaccessible areas at new Alaska Performing Arts Center

00044    inaccessible public transportation, which prevented persons with disabilities from getting to work

00046    lack of curb cuts in sidewalks near apartment building for persons with disabilities

00048    child erroneously placed in special education classes

00049    inaccessible new performing arts center

00050    Alaska Psychiatric Institute failed to provide interpretive services for deaf patients

00052    state and local agencies disregarded laws requiring accessibility

00055    jail failed to provide person with disability medical treatment

00056    inaccessible government buildings in Seward

00057    inaccessible public transportation

00058    city failed to train employees how to communicate with people with hearing impairments

00059    segregated seating and inaccessibility at new performing arts center

00061    inaccessibility of State Ferry Columbia and Alaska Railroad; denial of job interview because person was in a wheelchair

00062    inaccessible new performing arts center

00063    person using a respirator denied access to Alaska State Division of Medical Assistance

00065    inaccessible city hall

00067    school district retaliated against teacher for asking to be assigned to an accessible classroom

00069    inaccessible public transportation

00070    lack of curb cuts; inaccessible public transportation

00071    state agencies failed to provide interpretive services for deaf pecple

00072    department of motor vehicles failed to provide interpretive services

00073    inaccessibility of Seward City Hall and other state and local buildings

00075   state university failed to assist in covering expense of interpretive services for deaf graduate student

00076   inaccessible public buildings

00077   inaccessible public school

## ARIZONA
*Page No.*

00090   survey showing inaccessibility problems in city of Phoenix's public services

00110   inaccessible public transportation

00112   inaccessible restrooms at state recreation areas

00116   department of motor vehicles failed to provide visual signs or other assistance for people with hearing impairments

00117   person with disability denied police officer job

00119   Arizona Department of Economic Security took 3½ to 4 years to fix unsafe van lift

00121   county paratransit refused to provide transportation to college

00124   department of motor vehicles placed restrictions on driver's license because of deafness

00125   teacher with hearing impairment denied numerous jobs

00127   department of motor vehicles failed to assist deaf people

00129   inaccessible entrance, restroom, water fountain, and office at building leased by State

00130   woman injured trying to use inaccessible restroom at roadside rest stop; lack of curb cuts

00131   inaccessible social service agencies

## ARKANSAS
*Page No.*

00136   public school failed to enforce accommodations for student

00138 public school teacher refused to allow student with disability to use authorized calculator

00139 state university failed to inform student with hearing impairment about activities and rules

00140 lack of curb cuts

00141 inaccessible public transportation

00143 inaccessible office area at public housing for persons with disabilities

00144 inaccessible public transportation

00145 inaccessible state office of human services; state agencies failed to hire persons with disabilities

00146 failure to enforce handicapped parking law

00147 school erroneously placed child with mobility impairment in special education classes

00149 public schools failed to provide interpretive services for deaf people

00150 inaccessible public transportation

00153 person with disability forced to resign employment because of architectural barriers

00154 public school held meetings and conferences at inaccessible locations

00155 physical barriers prevented citizens from voting

00156 rehabilitation services failed to assist people with all kinds of disabilities

00159 inaccessible city and county buildings

00161 human services office relocated to inaccessible building

00163 lack of curb cuts

CALIFORNIA
*Page No.*

00166 inaccessible public recreation sites

00168 California Relay System failed to provide telephone access to other States for deaf people

00180  public transit failed to provide visual signs for deaf people

00181  inaccessible public transportation

00202  California Children's Services refused to help with cost of caring for child with head injury at home

00206  inaccessible county buildings

00208  deaf people denied access to state agencies that lacked TDD's

00210  deaf people denied access to state agencies that lacked TDD's

00211  public transit failed to provide visual signs for deaf people

00212  public transit failed to provide visual signs for deaf people

00213  limited out-of-state telephone relay services

00214  inaccessible public transportation limited access to community college

00215  inaccessible public transportation

00218  deaf people denied access to state agencies that lacked TDD's

00219  state mental health services failed to provide access for deaf people

00220  government failed to provide interpretive services for deaf people

00221  inaccessible public transportation; lack of curb cuts

00222  inaccessible public transportation

00223  inaccessible airport; inaccessible public transportation

00224  California Relay Service failed to enable deaf people to make interstate calls

00225  California Relay Service failed to enable deaf people to make interstate calls

00226  inaccessible public transportation; inaccessible restrooms in public buildings

00227 University of California attempted to terminate employees with disabilities for taking medical leave

00231 state agencies failed to provide TDD's

00232 person denied opportunity to serve on jury because county failed to provide interpretive services for deaf people

00236 public school district failed to provide TTD for deaf parents

00237 California Relay Service failed to enable deaf people to make interstate calls

00240 lack of curb cuts; inaccessible public transportation

00241 inaccessible public transportation

00244 inaccessible public transportation

00245 California Civil Service Exam held at high school with inaccessible restrooms

00246 inaccessible restrooms in county administration building; lack of curb cuts

00247 inaccessible public transportation prevented persons with disabilities from getting to work; State failed to enforce laws requiring accessibility

00248 inaccessible public transportation

00249 California Relay Service failed to enable deaf people to make interstate calls

00250 inaccessible public transportation

00252 inaccessible public transportation

00253 inaccessible public transportation

00254 inaccessible county courthouse; street signals too fast for safe crossing by wheelchair

00255 public functions failed to provide interpretive services for deaf people

00258 deaf people denied access to state agencies that lacked TDD's

00261  California Basic Educational Skills Test discriminated against deaf adults who wanted to become teachers of deaf students

00262  department of motor vehicles required doctors to report patients with seizure disorders and revoked such patients' licenses, but did not require reporting of other conditions that could cause erratic driving

## COLORADO
*Page No.*

00266  person in wheelchair passed by five bus drivers, all of whom claimed that lifts were broken

00267  lack of curb cuts and ramps; inaccessible public transportation

00268  inaccessible public transportation

00269  inaccessible public transportation

00270  persons with disabilities placed in segregated public housing

00271  inaccessible public transportation

00272  lack of curb cuts forced person in wheelchair to use street

00273  inaccessible county courthouse

00274  inaccessible public transportation

00275  inaccessible public transportation in small cities; public schools failed to assist students with disabilities

00276  inaccessible public transportation; inaccessible public facilities and recreation sites

00277  political parties held caucuses at inaccessible private home

00280  children with developmental disabilities required to attend segregated schools

00281  public school system refused to transfer student with disabilities from special to regular school until she brought suit

00283  vocational rehabilitation agency refused to take referrals from psychiatric halfway house; person denied driver's license in Virginia because of mental illness

## CONNECTICUT
*Page No.*

00285  public school inaccessible to parent with disability

00289  state university denied renewal of contract for graduate assistantship because of age and disability

## DELAWARE
*Page No.*

00301  inaccessible public high school; inaccessible public transportation

00302  inaccessible public schools; inaccessible public transportation

00303  inaccessible voting machines; inadequate handicapped parking

00308  man with physical disability spent 45 minutes crawling into polling place because it was inaccessible to wheelchairs

00310  inaccessible public transportation; public ceremony held at inaccessible building

00314  failure to enforce laws requiring handicapped parking spaces, which were usually occupied by police cars

00315  high percentage of children with disabilities placed in segregated schools

00317  restrictive zoning limited reintegration of institutionalized people into community

00319  inaccessible voting system

00323  inaccessible public transportation

00325  inaccessible public transportation made person with disability late for work; inaccessible library and other public buildings

00329    State refused to fund services for people with mental illness

00330    state transit system provided special vouchers for persons with physical disabilities, but not for mentally ill

00331    state criminal justice system failed to provide psychiatric treatment

00333    State kept child with schizophrenia in Delaware State Hospital because it lacked services for people who could be released

00335    state labor department's restrictive policies prevented persons with disabilities from applying for employment

00336    failure to enforce laws requiring handicapped parking spaces, which were usually occupied by police cars

00337    public transportation refused to transport person carrying oxygen

00338    staff and patients at Delaware State Hospital sexually abused women patients

00343    inaccessible public transportation

00345    state police interrogated deaf citizens without providing interpretive services

00347    vocational high school sought to transfer student back to special segregated school

## GEORGIA
*Page No.*

00362    public colleges failed to provide assistance for students with learning disabilities

00365    University of Georgia students with disabilities faced architectural barriers, inaccessible public transportation, lack of housing, and failure to enforce handicapped parking laws

00366 inaccessible classrooms at University of Georgia

00367 University of Georgia located its office of handicapped services in inaccessible second floor office

00370 University of Georgia charged students with learning disabilities $600 per quarter for services that other students with disabilities received at no cost

00371 Learning Disability Adult Clinic at University of Georgia charged unreasonable fees

00372 inaccessible public transportation

00374 traffic court failed to provide interpretive services for deaf person

## HAWAII
*Page No.*

00444 inaccessible public transportation

00446 inaccessible public transportation

00448 state university failed to enforce handicapped parking laws

00451 state employee in wheelchair forced to resign job because frequently unable to get to office due to broken elevator in state building; State Commission on the Handicapped refused employee's request for reasonable accommodation

00452 state university failed to provide blind student with timely or adequate books on tape for coursework; lack of signs or information for blind people using public transit

00455 person with disability denied opportunity to testify because department of labor held hearing in an inaccessible room

00456 state employment agency refused to provide interpretive services for deaf people

00457 public school put three-year-old deaf child in same class as fourth graders

00458    quadriplegic person who had California driver's license denied license by Hawaii

00460    state government office refused to interview persons with emotional disorder or history of alcoholism

00461    inaccessible state buildings

00462    person with mobility impairment denied serious consideration for state job due to unreliability of accessible public transportation

00463    inaccessible public transportation prevented person with disability from getting to work; inaccessible public buildings

00464    lack of curb cuts forced person in wheelchair to use street

00467    elevators in public buildings not marked for blind people; bus drivers failed to announce stops for blind people

00468    inaccessible public transportation; bus drivers harassed mentally retarded passengers

00469    inaccessible public transportation

00472    state mental health system had restrictive institutional policies

00473    state social service employees placed limits on opportunities for persons with disabilities based on stereotypical assumptions

00474    lack of curb cuts and ramps

00475    inaccessible public transportation

00476    inaccessible public transportation

00477    inaccessible public library

00479    denial of certain licenses to persons with mental disabilities

00480    inaccessible restroom in state park; lack of curb cuts

00484    state and local government meetings failed to provide interpretive services for deaf people

00485    students with disabilities unable to participate in school interscholastic sports

00486 blind people prevented from traveling outside State because quarantine laws permitted no exemption for their guide dogs

00487 state mental health services unavailable for deaf people due to failure to train staff

00488 inaccessible public transportation; inaccessible city and county buildings

00490 handi-van refused service to person paralyzed from waist down

00491 inaccessible public transportation

00492 state agencies failed to monitor conditions in community residential facilities for persons with disabilities

00494 inaccessible public transportation

00495 inaccessible public transportation

00496 inadequate assistance for deaf person at court appearance

## IDAHO
*Page No.*

00502 inaccessible public transportation

00505 inaccessible public transportation

00506 adult victims of abuse with developmental disabilities denied equal rights to testify in court

00507 inaccessible public recreation activities

00508 inaccessible public transportation

00509 lack of curb cuts

00510 inaccessible public transportation

00511 city and county failed to provide assistance for deaf people at public meetings

00514 inaccessible public transportation

00515 public school failed to provide adequate assistance for students with disabilities

00516 inaccessible public transportation

00517  public defenders' offices and public meetings failed to provide interpretive services for deaf people; police harassed persons with disabilities who appeared to be intoxicated

00518  vocational rehabilitation agency lacked TTY service

00521  government agencies lacked staff to assist people with head injuries

00522  inaccessible public transportation

00523  inaccessible public transportation

00524  inaccessible public transportation; inaccessible public buildings

00528  limited access at new county courthouse, library, and city hall

00531  school district refused to hire licensed teacher because of speech impediment

00533  public school failed to provide assistance for deaf student

00537  public school failed to provide interpretive services for deaf student

00540  Idaho lacked statewide telephone relay service for deaf people

00541  department of employment and department of health and welfare lacked telephone access for deaf people

00543  inaccessible restrooms at public high school; student in wheelchair denied admission to regular classes

## ILLINOIS
*Page No.*

00546  state system for providing ballots to people unable to enter polling place and special bus service caused long wait outside in cold weather

00548  schools that mainstream deaf children refused to hire deaf teacher

00553  government failed to provide interpretive services for deaf people at public hearing on school budget

00554 lack of curb cuts; inaccessible public transportation

00559 department of rehabilitation limited services to persons with disabilities by threatening placement in nursing home

00569 police stations lacked TTY service

00572 deaf people arrested and held in jail overnight without explanation because of failure to provide interpretive services

00573 inaccessible polling place

00574 inaccessible public schools prevented attendance at PTA meetings

00575 inaccessible public transportation

00576 inaccessible public transportation

00578 lack of curb cuts and ramps for wheelchairs

00579 most state housing agencies lacked telecommunications devices or interpretive services for deaf people

00581 state and local government agencies lacked telecommunications devices for deaf people

00583 emergency medical, police, and fire services lacked TDD's or personnel trained to receive TDD calls

00585 inaccessible public pools; inaccessible restrooms in municipal building

00586 inaccessible public transportation

00587 inaccessible polling place

00588 inaccessible polling place

00589 inaccessible public transportation

00590 inaccessible public transportation

00591 inaccessible library

00592 inaccessible voting system

00594 inaccessible polling place

00595 lack of curb cuts

00596 inaccessible public transportation

00597 inaccessible public transportation

00600 inaccessible public transportation

00603 inaccessible public transportation

00605  lack of curb cuts; inaccessible public buildings; inaccessible public transportation; inaccessible polling place

## INDIANA
*Page No.*

00608  state vocational rehabilitation agency refused to help person it classified as severely disabled

00609  for five years, state vocational rehabilitation agency failed to provide assistance

00612  inadequate curb cuts

00613  inaccessible public transportation

00616  inaccessible public transportation

00618  inadequate curb cuts

00619  inaccessible public transportation; inaccessible public facilities

00621  inaccessible public transportation

00622  government agencies failed to provide interpretive services and TTY/TDD's for deaf people

00629  deaf counselors discouraged from applying for jobs as rehabilitation counselors for deaf people

00637  staff at state psychiatric facilities abused and physically dragged patients

00644  person with disability dismissed as director of deaf unit at Central State Hospital

00651  public meetings held at inaccessible locations

00653  inaccessible polling place

00655  state counselors failed to provide rehabilitation assistance to person with head injury

## IOWA
*Page No.*

00659  person dismissed as city bus operator after seeking treatment for mental illness

00664  state commission failed to supply necessary equipment for deaf and blind employee

00665    high school limited opportunities for mentally re-
tarded student to be integrated

## KANSAS
*Page No.*

00670    Kansas Commission of Civil Rights denied legally
blind person job as investigator because of lim-
ited ability to drive and refused to allow accom-
modation that would have permitted use of public
transportation

00673    police failed to provide interpretive services after
arresting deaf man

00676    Kansas Department of Transportation fired person
because she had epilepsy

00679    state investigator failed to examine employment dis-
crimination claims

00685    inaccessible public transportation

00695    county failed to assist mentally ill with housing and
vocational opportunities

00696    damaged sidewalks and poor street lighting posed
risk to persons with disabilities

00704    inaccessible city-owned arena

## KENTUCKY
*Page No.*

00706    bus driver bypassed person standing at stop with
guide dog

00709    inaccessible public transportation

00712    department of employment services failed to make
reasonable accommodations for persons with dis-
abilities

00717    lack of curb cuts; inaccessible public transportation

00720    inaccessible public transportation

00723    state employment service refused to place person in
wheelchair

00724    inaccessible public buildings

00729 public library, police department, and state university library lacked personnel trained to use TTY devices

00731 state university failed to provide assistance to part-time teacher with a disability

00732 State prevented deaf teachers from teaching deaf students by requiring courses such as music education

00733 inaccessible public transportation

00736 inaccessible public transportation

00740 Kentucky School for the Deaf preferred hiring hearing teachers rather than deaf teachers

## LOUISIANA
*Page No.*

00743 inaccessible housing for graduate students at Louisiana State University

00745 inaccessible public transportation

00748 police assumed person with coordination problems was drunk

00751 inaccessible public transportation

00752 vocational rehabilitation program failed to provide services for person with head injury

00753 inaccessible public transportation prevented persons with disabilities from getting to work

00758 inaccessible voting machine

00759 Louisiana Sheriffs Pension and Relief Fund denied membership to person with disability

00773 inaccessible public transportation; lack of curb cuts

00776 inaccessible buildings at Louisiana State University

## MAINE
*Page No.*

00778 inadequate sidewalk ramps; failure to enforce handicapped parking laws

00780  failure to enforce state regulations requiring accessibility in public buildings

00782  town refused request for interpretive services for deaf people at town meeting

## MARYLAND
*Page No.*

00785  public transportation unsafe for persons with disabilities

00787  public libraries, state prison, and other state offices lacked TDD's

00788  department of human relations failed to provide interpretive services for deaf people and did not answer TTY calls

00789  vocational rehabilitation counselors failed to help deaf people find jobs

00797  inaccessible public transportation

00798  state hospital refused to provide interpretive services for deaf people

## MASSACHUSETTS
*Page No.*

00808  Office for Children refused to license blind person as day-care assistant

00812  inaccessible courthouse

00813  inaccessible restrooms in state building and state armory

00816  state college threatened to terminate employee because of blindness

00829  Massachusetts Adoption Exchange refused to let family with mother who had muscular dystrophy adopt child

00835 department of vocational rehabilitation hired able-bodied person instead of qualified person in wheelchair

## MICHIGAN
*Page No.*

00920 person denied admission to University of Michigan Medical School because of speech impediment

00921 inaccessible state university campuses

00922 65 percent of voting precincts in Detroit inaccessible

00923 buses with lifts often failed to stop for people in wheelchairs or their lifts did not work

00924 state employee threatened with discipline for serving on and attending meetings of Equal Employment Opportunity Commission advisory committee

00925 state university stadium lacked accessible restrooms, water fountains, and telephones

00926 inaccessible public transportation

00928 school system failed to hire teachers who could communicate with deaf students

00932 state university denied interpretive services to part-time deaf student

00933 public transportation refused to serve persons in wheelchairs; public agency refused to provide interpretive services for deaf people

00939 state university had transportation system for students with disabilities but not for faculty and staff

00947 state university lacked adequate curb ramps

00950 State denied driver's license to person with epilepsy

00958 inaccessible public recreation facilities

00960 inaccessible government buildings

00961 state university denied sabbatical proposal of faculty member with disability

00963 Michigan Rehabilitation Services placed people in inappropriate positions

00964 Michigan Rehabilitation Services failed to accommodate mentally ill persons

00968 inaccessible public transportation

00969 man with disability forced to use girls' restroom at state job

00970 person with disability terminated from county job and banned from future county employment

## MINNESOTA
*Page No.*

00974 person with disability and score of 100 was finalist for job as director of agency for the blind, but able-bodied person with score of 70 was hired

00980 person with cerebral palsy humiliated at interview for job with state department of education

## MISSISSIPPI
*Page No.*

00853 inaccessible public transportation

00855 inaccessible beaches, pools, and parks

00984 inaccessible classrooms and library at Mississippi School for the Deaf

00985 no state agency to provide or coordinate community service programs for deaf adults

00986 inaccessible classrooms at Mississippi School for the Deaf

00987 public programs failed to provide interpretive services for deaf people; government failed to post caution signs warning drivers of deaf children

00988 inaccessible polling places and voting booths

00989 inaccessible public buildings

00990 courts refused to pay for qualified interpretive services for deaf people

00992 inaccessible state university building

00993 teacher denied position at public elementary school because of need for braces and a cane to walk

412

00994    lack of curb cuts; inaccessible public school rooms; inaccessible public transportation

00996    inaccessible department of motor vehicles

00997    inaccessible public transportation; inaccessible public facilities

00998    inaccessible courthouses

00999    state university instructor refused to teach blind person

01000    inaccessible public transportation

01001    inaccessible polling place; city employee required to go outside to get to restroom

## MISSOURI
*Page No.*

01003    lack of curb cuts

01004    inaccessible restrooms in public buildings; lack of curb cuts

01006    public schools segregated children with disabilities; inaccessible school buildings

01009    inaccessible public transportation and public buildings such as post offices, libraries, schools, and polling places

01010    state university tried to discourage blind person's chosen field of study

01013    inaccessible public transportation

01015    courthouse failed to provide amplified sound system in courtrooms

## MONTANA
*Page No.*

01017    inadequate curb cuts

01022    inadequate curb cuts in downtown area

01023    state agencies refused to make reasonable accommodations to paraplegics seeking employment

01024    inaccessible polling place

01026   person in wheelchair forced to vote in street

01027   inaccessible polling place

## NEBRASKA
*Page No.*

01029   government failed to provide interpretive services for deaf people serving on juries, commissions, and committees

01031   local school district failed to provide interpretive services for deaf child

01034   inaccessible entrance at office of county assistance

## NEVADA
*Page No.*

01038   local government failed to provide assistance for people with head injuries

01043   inaccessible government buildings and public facilities

01044   person with disability denied access to public transportation because it took too long to get on and off bus

01046   community college refused to provide interpretive services for deaf people

01050   city ordinance prevented mentally ill from living in residential areas

01051   inaccessible public transportation; inadequate curb cuts and ramps

01053   failure to enforce handicapped parking laws

01054   lack of sidewalk and crosswalk accommodations for persons in wheelchairs

## NEW HAMPSHIRE
*Page No.*

01057   state agency failed to assist persons with head injuries despite availability of state surplus funds

414

01061   vocational rehabilitation counselor tried to cut off funds and assistance to person with disability

## NEW JERSEY
*Page No.*

01067   commission for the blind and visually impaired demoted visually impaired person

01068   zoning commission denied permission to open home for persons with head injuries

01069   architectural barriers on Cumberland County College campus

01072   inadequate curb cuts

## NEW MEXICO
*Page No.*

01080   state university denied entry into school of social work to blind person but admitted partially sighted person with lower grades

01083   New Mexico lacked statewide TDD relay service

01091   prisoners with developmental disabilities subjected to longer terms and abused by other prisoners in state correctional system

01092   inaccessible public transportation

01095   University of New Mexico failed to provide assistance for blind student

01097   city and county government offices lacked TDD's

01098   University of New Mexico hospital failed to provide interpretive services for deaf patients

01099   University of New Mexico failed to provide interpretive services for deaf students

01100   inaccessible buildings on University of New Mexico campus

## NEW YORK
*Page No.*

01109 state agencies failed to hire persons with disabilities

01114 custodian in public high school denied request of person with disability to use locked elevator

01119 at state legislature, person in wheelchair had to wait 45 minutes to use freight elevator

01129 public village meetings held in second floor meeting room with no elevator; many polling places inaccessible

01130 lack of curb cuts; failure to enforce handicapped parking laws

01134 inaccessible state parks and public beaches

## NORTH CAROLINA
*Page No.*

01144 public elementary school initially denied admission and then charged extra fee for child with Down's Syndrome to attend afterschool day-care program

01155 blind people told not to participate in regular public parks and recreation programs

01158 state agencies, other than services for the blind and vocational rehabilitation, employed few persons with disabilities

01161 police arrested and jailed deaf person without providing interpretive services

## NORTH DAKOTA
*Page No.*

01170 person with disability denied access to driver's license exam because held in inaccessible room

01172 inaccessible polling places

01175 lack of curb cuts; failure to enforce handicapped parking laws; inaccessible polling places; inaccessible city government meetings

01178 failure to enforce handicapped parking laws

01183 inaccessible polling places; inaccessible state and local government buildings

01185 government agencies failed to enforce policies regarding hiring persons with disabilities; inaccessible polling places; inaccessible public buildings

01186 state and local government failed to hire persons with disabilities; inaccessible polling places

01187 failure to enforce handicapped parking laws

01196 person with head-injury disability denied consideration for position of election polls inspector

## OHIO
*Page No.*

01215 city failed to trim trees regularly, which posed a hazard to blind people

01216 inaccessible state, county, and city buildings

01218 inaccessible social service agency offices; inaccessible public transportation

01221 vocational rehabilitation agency denied assistance to person with disability

01224 rehabilitation services agency failed to assist paranoid schizophrenic

01229 vocational rehabilitation agency discouraged person with disability from being a nurse

01230 persons with disabilities denied jobs because of inaccessible public transportation

01231 blind person denied driver's license though legally eligible

01234 inaccessible public transportation; lack of curb cuts

01235 public paratransit system often left passengers stranded

01236 vocational rehabilitation agency steered person with mental disability to menial job, despite his Ph.D. degree

01239   police failed to provide interpretive services for deaf person who was arrested

01241   Cleveland State University lacked wheelchair ramps

01242   inaccessible public transportation

## OKLAHOMA
*Page No.*

01251   Tulsa Housing Authority failed to communicate with and provide information to tenants with disabilities

01258   state employment office lacked TDD or workers with interpretive skills; state university paid deaf employees less than hearing employees; state agencies made no effort to hire deaf applicants

01265   police officer pointed gun at person with disability who could not get out of car quickly

01266   inaccessible public transportation

01269   person with speech impediment denied numerous state jobs

01271   inaccessible restrooms at city parks

01275   state government held meeting at hotel with inaccessible restrooms

01278   person in wheelchair worked at polling place with inaccessible restrooms

01280   inaccessible polling places

01286   qualified blind person who offered to provide own driver denied job as state social worker

## OREGON
*Page No.*

01370   blind people unable to access printed material from state government

01375   school system barred child with cerebral palsy from physical education class and gave her cleaning job instead

01377 person with two college degrees and extensive professional experience turned down for appropriate state government jobs and advised to seek entry-level jobs because of his disability

01378 commission for the handicapped lacked funds to enforce laws

## PENNSYLVANIA
*Page No.*

01391 public library had restrictive policy regarding issuance of library cards to residents of group homes

01397 government failed to provide interpretive services for deaf people at school budget hearing

01399 inaccessible public transportation

01407 inaccessible polling places

01408 inaccessible public transportation

01409 inaccessible polling places

01410 inaccessible polling place

01413 inaccessible public transportation; lack of curb cuts

01421 inaccessible public library

01423 inaccessible automatic ticket dispensers on Pennsylvania Turnpike

01425 bus drivers refused to transport person in wheelchair

01427 inaccessible county offices

01429 lack of curb cuts

01430 GED programs offered at inaccessible public schools; bus drivers unwilling or unable to use wheelchair lifts

01432 child unable to enroll in first grade because of inaccessible classroom

01434 lack of curb cuts; inaccessible public transportation

01435 lack of curb cuts in rural areas

01436 inaccessible polling place

01439    unsafe curb cuts

01441    inaccessible state office building

## SOUTH CAROLINA
*Page No.*

01454    government failed to provide 911 emergency service for deaf people

01457    state and local agencies, library, and police and fire departments lacked TDD's; government failed to provide interpretive services for deaf people at meetings

## SOUTH DAKOTA
*Page No.*

01466    school district failed to provide adequate services to child with disability

01467    traffic light and fire hydrant placed where they posed obstacle to blind pedestrians and those in wheelchairs who needed to use curb cuts

01469    inaccessible polling places

01470    inaccessible public transportation

01472    State failed to hire persons with disabilities without giving a reason

01475    criminal court failed to provide interpretive services for deaf people

01476    state university denied blind student opportunity to practice teach as required for teaching certificate

## TEXAS
*Page No.*

01483    poles obstructed sidewalks; lack of curb cuts; inaccessible public transportation

01503    state teachers' exam required deaf teachers who wanted to teach deaf children to pass section on speech assessment and listening

420

01514 medical examination required for renewal of driver's license despite unblemished 20-year driving record

01520 inadequate handicapped parking spaces

01521 state vocational rehabilitation agency refused to assist college student who chose to major in political science

01522 employee of county human services agency denied handicapped parking place

01526 failure to enforce handicapped parking laws

01527 inaccessible state university transportation system

01529 denial of driver's licenses or accommodations to take driver's test

01531 inaccessible buildings at state university

01536 state hospital sought to discharge mentally ill boy with HIV

01540 special transit system refused to transport man with mental retardation though he could not use regular bus

01542 deaf man not permitted to take state cosmetology exam with assistance from interpreter

01543 blind man not permitted to take state chiropractic exam because he could not read x-rays alone

01549 deaf instructors unable to pass state teachers' exam for teachers of deaf students that assessed speech and language skills

01551 inadequate handicapped parking and enforcement

## UTAH
*Page No.*

01554 state rehabilitation service had never hired deaf counselor or administrator

01556 child denied admission to public school because first-grade teacher refused to teach him

01563 public school failed to implement state review panel findings regarding accommodation for child with disability

01576    state office for persons with disabilities failed to hire such persons; inaccessible public transportation

01577    state government denied persons with disabilities upper level management jobs

01580    rehabilitation services agency discriminated against employee with reading disability

01581    qualified blind teacher denied job and told that school needed teacher who could also coach football, but school hired sighted person who was not a coach

01584    inaccessible public transportation

01586    inaccessible government office

01587    public school teacher refused to give child with learning disability his grades and said he did not belong in public school

01592    Utah denied mainstream education to child with Down's Syndrome, though child had been mainstreamed in another State

01595    person with disability involuntarily hospitalized and abused by state university hospital

01613    inaccessible public high school facilities

## VERMONT
*Page No.*

01634    zoning board denied use permit for community mental health center

## VIRGINIA
*Page No.*

01642    student with learning disability misclassified as mentally retarded and deemed ineligible to take drama class at public school

01646    inaccessible buildings at state school for blind and deaf youth

01647    failure to enforce handicapped parking laws

01654    inaccessible restrooms in government buildings; failure to enforce handicapped parking laws

01656 state programs for persons with disabilities failed to communicate with deaf people

01660 lack of state institutional care to rehabilitate people with head injuries

01663 inaccessible traffic court

01664 inaccessible public transportation

01667 lack of curb cuts

01668 inaccessible public transportation prevented persons with disabilities from voting

01671 state and local government failed to provide interpretive services for deaf people at meetings

01674 lack of curb cuts outside county courthouse

01675 deaf people denied access to 911 emergency services

01676 inaccessible courthouse

01677 inaccessible public transportation

01678 lack of curb cuts and ramp for access to courthouse

01679 inaccessible county courthouse

01680 inaccessible courthouse and library

01682 inaccessible high school

01683 lack of curb cuts at city's main intersection

01684 person in wheelchair received ticket for obstructing street traffic even though sidewalks not accessible

01686 inaccessible transportation on state university campus

## WASHINGTON
*Page No.*

01690 deaf people required to pay for interpretive services in court

01692 state government's lack of TDD deterred deaf people from applying for employment

01694 government office lacked TDD and interpretive services for deaf people

01696   state human rights commission lacked staff to pursue case of discrimination against blind person

01706   community college failed to provide interpretive services for deaf students or to assist students with disabilities in other ways

01716   local sheriff's department discontinued TDD

01717   inaccessible restroom at state ferry terminal

## WEST VIRGINIA
*Page No.*

01742   inaccessible public transportation

01745   sheriff denied person with disability use of elevator in courthouse

01746   law enforcement agencies lacked ability to communicate with deaf people

## WISCONSIN
*Page No.*

01752   public school recreation program refused to provide interpretive services for deaf child

01755   state university hospital and sheriff's office failed to provide TDD's or trained personnel

01756   inaccessible polling places

01757   person with disabilities denied admission to graduate study at state university

01758   inaccessible city hall

01759   state offices lacked TDD's and failed to provide material in braille or on tape

01760   department of motor vehicles revoked person with diabetes' driver's license despite doctor's report

01761   inaccessible public transportation; lack of curb cuts or ramps

01766   department of motor vehicles tried to revoke license of person who used hand controls in car

01767  inaccessible polling places

01771  blind and deaf people denied equal access to jury service

## WYOMING
*Page No.*

01773  State lacked telephone relay system for deaf people

01775  inaccessible state buildings

01777  department of motor vehicles denied driver's license to person with epilepsy

01780  inaccessible buildings at state university

01781  zoning board denied permit for group home for persons with disabilities

01786  person in wheelchair denied marriage license because courthouse was inaccessible