**NEW DIRECTIONS TREATMENT SERVICES, et al.**

v.

**CITY OF READING, et al.**

**No. Civ.A. 04–1311.**

United States District Court,
E.D. Pennsylvania.

Aug. 19, 2005.

Barbara E. Ransom, Philadelphia, PA, for New Directions Treatment Services, et al.

Maren Reichert, Ryan J. Fleming, Fox Rothschild, LLP, Steven K. Ludwig, Philadelphia, PA, for City of Reading, et al.

## MEMORANDUM AND ORDER

DIAMOND, District Judge.

The City of Reading, acting pursuant to a Pennsylvania zoning statute, has denied the request of a methadone treatment center to operate in a residential neighborhood within the City. The center and six of its patients ask me to declare this zoning decision unconstitutional and illegal, and "to issue a permanent injunction enjoining Reading to grant [the] zoning permit." (Pl. Mot. for Sum. Jud. at 1.) The Third Circuit has cautioned, however, that "the federal courts should not sit as a 'zoning board of appeals.'" *Lindquist v. Buckingham Twp.*, 106 Fed.Appx. 768, 782 (3d Cir.2004); *see also UA Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 402 (3d Cir.2003) (*citing Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.1982) (*quoting Belle Terre v. Boraas*, 416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting))). Because that authority controls here, I grant the City's motion for summary judgment and dismiss the Complaint.

## PROCEDURAL HISTORY

On March 25, 2004, Plaintiffs, New Directions Treatment Services and six anonymous patients, filed a class action complaint against Reading, the President of the Reading City Council, and seven current or former Council members. Plaintiffs alleged that the City's denial of NDTS's permit to operate a methadone treatment facility violated: (1) the Due Process and Equal Protection Clauses of the Constitutions's Fourteenth Amendment; (2) Section 504 of the Rehabilitation Act (29 U.S.C. § 794); (3) Title II of the Americans with Disabilities Act (42 U.S.C.

§ 12101 *et seq.*); and (4) the Constitution's Supremacy Clause. The matter was reassigned to me on July 19, 2004. On August 30, 2004, I denied without prejudice Plaintiffs' class certification motion because Plaintiffs failed to provide Defendants with sufficient information to determine the adequacy of the class representatives. Plaintiffs did not again seek to certify the class. In October 2004, I dismissed the Supremacy Clause claim and all claims against the individual Council members in both their official and individual capacities. In February 2005, the Parties filed cross-Motions for Summary Judgment. Pennsylvania's Attorney General also filed a brief supporting the constitutionality of the zoning statute at issue in this case. On March 24, 2005, I heard oral argument on the motions, and asked for additional briefing on the issues of preemption and procedural due process.

### UNDISPUTED FACTS

There appear to be few material facts in genuine dispute here. Rather, the parties differ considerably in their legal analyses. Accordingly, I will first set out those background facts that are uncontested.

#### The Proposed Treatment Facility

NDTS operates methadone treatment facilities in Pennsylvania, including one in West Reading. (Compl. at ¶¶ 13, 57; Def. City of Reading's Mot. for Sum. Jud. at Ex. C.) These facilities provide methadone maintenance treatment for adults who have been addicted to heroin for at least one year. (Def. City of Reading's Mot. for Sum. Jud. at Ex. A (Cooper Dep at 83, 86, 95–96), Ex. D (Desmond Dep. at 24–25, 35, 38–46); Compl. at ¶¶ 14, 57.) The "vast majority" of NDTS's patients are also addicted to other illegal drugs. (Def. City of Reading's Mot. for Sum. Jud. at Ex. D (Desmond Dep. at 24–25).) At any time, approximately 20 to 30 percent of NDTS's patients would test positive for some illegal drug, and on several occasions patients have been arrested for illegal drug use and possession while at NDTS's facilities. (Def. City of Reading's Mot. for Sum. Jud. at Ex. A (Cooper Dep. at 86).) Because of its patients' continuing dependence on illegal drugs, "NDTS gives [them] ample opportunity for stabilization and rehabilitation, recognizing that relapse [—i.e. resuming the use of drugs—] is part of the recovery process." (Compl. at ¶ 15; Def. City of Reading.'s Mot. for Sum. Jud. at Ex. A (Cooper Dep. at 83.).)

In January 2001, hoping to expand its services beyond the West Reading facility, NDTS's Executive Director contacted Reading to discuss opening a new methadone treatment center. (Def. City of Reading's Mot. for Sum. Jud. at Ex. E.) He spoke to the Coordinator of the City's Business Resource Center, who suggested that NDTS meet with the City's Zoning and Planning Department to explore the possibility further. (*Id.*) On January 24, 2001, NDTS met with the Coordinator and representatives from the Zoning and Planning Department to discuss potential sites within the City for a methadone treatment facility. (Def. City of Reading's Mot. for Sum. Jud. at Ex. A. (Cooper Dep. at 99–101).) In March 2001, NDTS met with the City Council further to discuss the proposed center. (*Id.* at 50–53, 102–03.) The meeting was "congenial, productive, and serious"; Council showed a commitment to work with NDTS to find an appropriate location for the center, although it did not commit to a particular site. (*Id.* at 50–53, 102–03.)

Sometime after the March meeting, NDTS decided that it would not continue to wait for the City: it wanted to open a new facility immediately on a property located at 700 Lancaster Avenue. Zoned for

commercial and residential use, the property is less than two miles from the West Reading facility and situated on a commercial highway that is interspersed with approximately 40–75 residences. (Compl. at ¶¶ 62–66; Def. City of Reading's Mot. for Sum. Jud. at Ex. F, Ex.G.) The site previously was occupied by the Berks Counseling Center, which treated patients with mental health problems and drug addictions, but did not provide methadone treatment. (Compl. at ¶¶ 62–66; Def. City of Reading's Mot. for Sum. Jud. at Ex. F, Ex.G.)

At the Lancaster Avenue site, NDTS intended to serve "a couple hundred or so" methadone patients, as well as patients seeking mental health and other drug and alcohol treatment. (Def. City of Reading's Mot. for Sum. Jud. at Ex. B (Hearing Tr. at 27).) To accommodate this increased use, NDTS wanted to enlarge the existing facility by approximately 4,000 square feet. (Id.) NDTS planned to operate the facility from 5:30 a.m. to 6:00 p.m., Monday through Friday, as well as four and a half hours on Saturday mornings, and three hours on Sunday mornings. (Id. at 27–28.) The West Reading facility is open from 6:00 a.m. to 6:00 p.m. from Monday through Friday, 6:00 a.m. to 10:00 a.m. on Saturday, and 8:00 a.m. to 12:00 p.m. on Sunday. (Def. City of Reading's Mot. for Sum. Jud. at Ex. D (Desmond Dep. at 20).)

On August 21, 2001, without first obtaining an operating permit from the City, NDTS signed a ten-year lease for the Lancaster Avenue property. (Def. City of Reading's Mot. for Sum. Jud. at Ex. U (Commercial Office Lease for 700 Lancaster Avenue dated August 21, 2001).) NDTS only then submitted to the City a zoning permit application seeking approval to operate its proposed center at 700 Lancaster Avenue. (Def. City of Reading's Mot. for Sum. Jud. at Ex. H (Zoning Permit Application), Ex. A (Cooper Dep. at 57).)

### Pennsylvania's Zoning Requirements

In 1999, Pennsylvania adopted 53 Pa. Cons.Stat. § 10621, a zoning statute respecting the location of methadone treatment facilities in municipalities throughout the Commonwealth. See 53 Pa. Cons.Stat. § 10621. The Statute prescribes the procedures a municipality must follow before it may grant zoning approval to a methadone treatment facility "within 500 feet of an existing school, public playground, public park, residential housing area, childcare facility, church, meetinghouse, or actual place of regularly stated religious worship." 53 Pa. Cons.Stat. §§ 10621(a)(1),(b). A majority of the municipality's "governing body" must vote to approve the zoning application. Id. At least 30 days before any such vote, the governing body must give written notice of the hearing to all those who reside within the 500 foot area. Id. Finally, the governing body must hold the hearing at least 14 days before it votes on the application. Id.

The Lancaster Avenue property is within 500 feet of a residential area as defined by Section 10621. (Pl. Mot. for Sum. Jud. at Ex. 1, 2.) See 53 Pa. Cons.Stat. §§ 10621(a)(1),(b). Accordingly, the City was obligated to comply with the Statute's requirements before it could approve the NDTS zoning application.

### The City Rejects the NDTS Zoning Application

Reading timely sent written notice that it would hold a public hearing on the NDTS application on January 14, 2002. As prescribed by the Statute, the entire City Council was present at that hearing. (Def. City of Reading's Mot. for Sum. Jud. at Ex. D (Hearing Tr. at 3, 22).) A city planner provided background on NDTS's application, and explained the approval requirements for the proposed center. (Id.

at 4–7.) NDTS described its history and the services that it intended to provide. (*Id.* at 7–14.) It also answered questions from Council members and the public about the proposed activities, potential problems with loitering and safety at the facility, the effects the facility would have on the community, and other possible sites for the facility. (*Id.*) NDTS acknowledged that it had experienced serious loitering and traffic safety problems at their West Reading center. (*Id.* at 18–19.) To allow for additional public comments and questions, the hearing was continued to February 28, 2002. (*Id.* at 54–58; Def. City of Reading's Mot. for Sum. Jud. at Ex. L (Minutes of City Council Meeting on Feb. 28, 2002).)

At its regularly scheduled March 25, 2002 meeting, Council considered a resolution to approve the NTDS zoning application. (Def. City of Reading's Mot. for Sum. Jud. at Ex. M (Minutes of City Council Meeting on Mar. 25, 2002).) Before voting, Council allowed the public to make additional comments. (*Id.*) Council then unanimously voted against approving the permit at the 700 Lancaster Avenue location. (*Id.*)

At all three Council hearings, Council members and City residents spoke, some supporting and others opposing the center at 700 Lancaster Avenue. (Pl. Mot. for Sum. Jud. at Ex. 18 (Pub. Hearing on Jan. 14, 2002); Def. City of Reading's Mot. for Sum. Jud. at Ex. B (Excerpts from Transcript of Public Hearing held on Jan. 14, 2002), Ex. L (Minutes of City Council Pub. Hearing of Feb. 28, 2002), Ex. M (Minutes of City Council Pub. Hearing of Mar. 25, 2002).)

On March 26th, Council President informed NDTS of Council's decision, and reiterated that Council "support[ed] the services offered by [NDTS] ... [and] would support a [NDTS] facility located in a non-residential area." (Def. City of Reading's Mot. for Sum. Jud. at Ex. N (Letter of City Council President to NDTS, dated Mar. 26, 2002).) He also stated that the City Council "would welcome the opportunity to work with [NDTS] to find a more suitable location." (*Id.*) NDTS responded that "for the near term, it did not plan to propose another location at which to offer methadone services." (Def. City of Reading's Mot. for Sum. Jud. at Ex. O (Letter from Executive Director of NDTS to President of City Council, dated Apr. 1, 2002).) The Council President reiterated that Reading was "not opposed to the program offered by [NDTS] and ... [was] not opposed to [NDTS] locating in a more suitable area of the City." (Def. City of Reading's Mot. for Sum. Jud. at Ex. P (Letter from President of City Council to Executive Director of NDTS dated Mar. 7, 2002).)

### NDTS Sues the City

NDTS did not have further discussions with the City. Rather, NDTS filed complaints with the U.S. Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity, and with the Pennsylvania Human Relations Commission. (Def. City of Reading's Mot. for Sum. Jud. at Ex. Q (HUD Complaint), Ex. L (PHRC Complaint).) Several months later, the PHRC apparently sent NDTS a letter stating that after conducting an investigation, the PHRC was dismissing NDTS's complaint "because the facts of the case [did] not establish that probable cause exist[ed] to credit the allegations of unlawful discrimination." (Def. City of Reading's Mot. for Sum. Jud. at Ex. S (PHRC letter, dated Jun. 30, 2003), Ex. T (PHRC letter, dated Dec. 23, 2003).)

In February 2004, NDTS wrote a letter to Readings's newly elected Mayor, hoping that he could persuade Council to change its decision. (Def. City of Reading's Mot.

for Sum Jud. at Ex. HH (Letter from Executive Director of NDTS to Mayor of Reading dated Feb. 11, 2004).) Without the assistance of a realtor, NDTS then sought to find properties in Reading that were not within 500 feet of a school, playground, park, residential area, or house of worship. (Pl. Mot. for Partial Sum. Jud. at Ex. 3 (Bellairs Real Estate Letter).) There is no admissible evidence in the record establishing that NDTS cannot find another location in Reading for its proposed center. (Def. Mem. in Opp. to Pl. Mot. for Partial Sum. Jud. at 2–3.)

On March 25, 2004, Plaintiffs filed the instant suit.

Reading has moved for summary judgment, asking me to dismiss Plaintiffs' Complaint in its entirety. Plaintiffs have cross-moved for partial summary judgment, arguing that Section 10621 both on its face and as applied violated their equal protection and procedural due process rights, as well as the ADA and Rehabilitation Act. Plaintiffs ask me to enter judgment in their favor and order the City to approve the NDTS zoning application for 700 Lancaster Avenue.

### LEGAL STANDARD

Upon motion of any party, summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must initially show the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In its review of the record, "the court must give the nonmoving party the benefit of all reasonable inferences." See Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir.1995), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). An issue is material only if it could affect the result of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after viewing all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. See Celotex, 477 U.S. at 322, 106 S.Ct. 2548; Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir.1987).

Because a motion for summary judgment looks beyond the pleadings, factual specificity is required of the party opposing the motion. See Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548. To prevail, the opposing party may not simply restate the allegations made in its pleadings or merely rely upon "self-serving conclusions, unsupported by specific facts in the record." Id. The opposing party must support each essential element with concrete evidence in the record. See id. at 322–23, 106 S.Ct. 2548. If the party fails to cite to such evidence, then the moving party is entitled to summary judgment. See Mennen Co. v. Atlantic Mut. Ins. Co., CIV. No. 92–5237, 1999 WL 33654297, *2, 1999 U.S. Dist. LEXIS 21916, at *8 (D.N.J. Oct. 26, 1999) (citation omitted); FED. R. CIV. P. 56(e).

### DISCUSSION

#### I: Equal Protection

Plaintiffs allege that the City applied Section 10621 in a manner that violated their equal protection rights, and, in the alternative, that because the Statute discriminates against them as methadone users, it is facially unconstitutional. To make out an equal protection claim, Plaintiffs must show that: (1) compared with others similarly situated, they were selectively treated; and (2) their selective treatment was motivated by an intention to discriminate on the basis of impermissible

considerations, to punish or inhibit the exercise of a constitutional right, or on the basis of a malicious intent to injure. *See Government of Virgin Islands v. Harrigan,* 791 F.2d 34, 36 (3d Cir.1986); *see also Homan v. City of Reading,* 963 F.Supp. 485, 490 (E.D.Pa.1997).

▮ Significantly, Plaintiffs appear to concede that I am obligated to employ a rational basis test in reviewing their equal protection claims. (Pl. Mem. in Opp. to Def. Mot. for Sum. Jud. at 14.) The level of scrutiny applied to an equal protection claim depends on how the complaining party is classified. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). For equal protection purposes, recovering drug addicts are classified as being "disabled." *See generally New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Rauso v. Sutton,* Civ. No. 99–2817, 2004 WL 1207640, **10–11, 2004 U.S. Dist. LEXIS 8986, at *33 (E.D.Pa. Mar. 30, 2004); 29 U.S.C. § 705(20)(C)(I); 42 U.S.C. § 12114(a). Claims with respect to disability are reviewed for "rational basis." *See Board of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 366–67, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (internal citations omitted). Under rational relationship review, the sovereign may, consistent with equal protection, base its actions on an individual's disability as long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.; see also Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The party challenging the action must show that "[no] reasonably conceivable set of facts ... could provide a rational basis for the classification." *See Heller,* 509 U.S. at 320, 113 S.Ct. 2637.

## A. *"As Applied" Challenge*

It is undisputed that during the January 14, February 28, and March 25, 2002, hearings, some City residents and Council members opined that it was undesirable to have recovering drug addicts near their residences, around their children, and near their schools and churches. (Pl. Mot. for Sum. Jud. at Ex. 18 (Pub. Hearing on Jan. 14, 2002); Pl. Mot. for Sum. Jud. at Ex. 13 (Spencer Dep. at 50); Def. City of Reading's Mot. for Sum. Jud. at Ex. B (Excerpts from Transcript of Public Hearing held on Jan. 14, 2002), Ex. L (Minutes of City Council Pub. Hearing of Feb. 28, 2002), Ex. M (Minutes of City Council Pub. Hearing of Mar. 25, 2002).) Citing to these remarks, Plaintiffs note that "vocal opposition to the operation of a methadone treatment facility was expressed at [the] hearings," and that the opposition was based on "stereotypes and fear." (Pl. Mot. for Sum. Jud. at 18.) Thus, Plaintiffs argue that the City's application of Section 10621 was unconstitutional, because its denial of NDTS's permit was based on an "irrational fear" to "segregate opiate dependent persons." (Pl. Mot. for Sum. Jud. at 21.)

▮ I will assume for purposes of deciding the motions before me that the remarks Plaintiffs have adduced could make out an impermissible basis for denying the NDTS zoning application. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,* 179 F.3d 725 (9th Cir. 1999); *see also Innovative Health Sys. v. City of White Plains,* 117 F.3d 37 (2d Cir.1997). That does not entitle Plaintiffs to summary judgment, however, nor is it sufficient to defeat Reading's summary judgment motion. Under a rational relationship analysis, Plaintiffs bear the affirmative burden of showing that *no* reasonably conceivable set of facts could provide a rational basis for the City Council's deci-

sion to deny the NDTS application. *See Board of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *see also Heller,* 509 U.S. at 320, 113 S.Ct. 2637; *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). "[U]nless [Plaintiffs can show that] the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes [such] that [one] can only conclude that [Council's] actions were irrational," I must uphold Council's decision. *See Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (*quoting Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)); *see also DeBlasio v. Zoning Bd. of Adj.,* 53 F.3d 592, 601 (3d Cir.1995); *Pace Resources, Inc. v. Shrewsbury Twp.,* 808 F.2d 1023, 1035 (3d Cir.1987).

■ Under these standards, the remarks Plaintiffs offer do not establish an equal protection violation. The rational basis test is premised on the understanding that legislative action is frequently the product of many motivations—some less reasoned than others. *See, e.g., Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 558, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("[I]t is virtually impossible to determine the singular 'motive' of a collective legislative body."). That is why the Supreme Court has held that to prevail under a rational basis test, the plaintiff must show that sovereign's actions could not have *any* conceivable rational basis. *Board of Trustees of the Univ. of Ala.,* 531 U.S. at 367, 121 S.Ct. 955; *see also Heller,* 509 U.S. at 320, 113 S.Ct. 2637.

On the record before me, there is a wealth of undisputed evidence showing that the City—concerned about the effect several hundred patients traveling to and from the expanded NDTS center would have on the area—had appropriate, permissible reasons for its decision. For instance, Council expressed safety and traffic concerns, noting that the high traffic volume and frequent automobile accidents in the Lancaster Avenue area created risks for the patients of the treatment center previously located there (which was some 4000 square feet smaller than the proposed NDTS facility). (Def. City of Reading's Mot. for Sum. Jud. at Ex. GG (Reed Dep. at 82).) Council also considered the substantial loitering and noise problems reported at NDTS's West Reading facility. (Def. City of Reading's Mot. for Sum. Jud. at Ex. B (Excerpts from Transcript of Public Hearing held on Jan. 14, 2002 at 18–19).) The increased vehicular and pedestrian traffic, double parking, and repeated instances of patient jaywalking across the street to NDTS's West Reading clinic also troubled Council. (Def. City of Reading's Mot. for Sum. Jud. at Ex. GG (Reed Dep. at 79).) Members of the public expressed concern about patients crossing the highway, loitering, double parking, and increasing traffic and pedestrian congestion. (Pl. Mot. for Sum. Jud. at Ex. 18 (Pub. Hearing on Jan. 14, 2002); Pl. Mot. for Sum. Jud. at Ex. 13 (Spencer Dep. at 50); Def. City of Reading's Mot. for Sum. Jud. at Ex. B (Excerpts from Transcript of Public Hearing held on Jan. 14, 2002), Ex. L (Minutes of City Council Pub. Hearing of Feb. 28, 2002), Ex. M (Minutes of City Council Pub. Hearing of Mar. 25, 2002).)

Only after considering these legitimate concerns did Council conclude that NDTS's facility would be better suited to a site other than 700 Lancaster Avenue. (Pl. Mot. for Sum. Jud. at Ex. 12) (Feb. 28, 2002 Public Hearing Minutes at 15–17); Pl. Mot. for Sum. Jud. at Ex. 13 (Spencer Dep. at 50); Def. City of Reading's Mot.

for Sum. Jud. at Ex. B (Excerpts from Transcript of. Public Hearing held on Jan. 14, 2002); (Def. City of Reading's Mot. for Sum. Jud. at Ex. N (Letter from Council President to Executive Director of NDTS).) Accordingly, the City indicated its willingness to work with NDTS to find a different location. (Def. City of Reading's Mot. for Sum. Jud. at Ex. P (Letter from President of the City Council to Executive Director of NDTS).)

Plaintiffs ask me to disregard as "clearly pretextual" the legitimate concerns expressed at the three Council hearings, and find instead that the City's actual motivation was discriminatory. (Pl. Combined Resp. to State's Amicus Brief and Def.'s Response at 22.) Yet, Plaintiffs also argue that the City was only *"in part* motivated by discrimination against methadone users." (*Id.* at 20 (emphasis added).) This apparent contraction underscores the great difficulty in Plaintiffs' argument.

As Plaintiffs seem to acknowledge, the City based its denial of the NDTS application on many concerns—some legitimate and some arguably not. I do not believe that under a rational basis test I am permitted to weigh and evaluate the sincerity of the legitimate concerns expressed at the Council hearings. As long as there is a *conceivable* legitimate basis for Council's actions, I must conclude that the actions comported with equal protection. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 17, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). To hold otherwise and order Reading to approve the NDTS zoning application (as Plaintiffs request), would require me to sit as a "zoning board of appeals"—exactly what the Third Circuit has held I may not do. *See United Artists Theatre Circuit, Inc.*, 316 F.3d at 402.

In these circumstances, the undisputed facts establish a clear and rational relationship between the City's decision to deny the permit, and "legitimate governmental purposes" respecting pedestrian and patient safety, traffic, loitering, and congestion. *See Heller*, 509 U.S. at 320, 113 S.Ct. 2637. Accordingly, I am compelled to conclude that the City's application of Section 10621 did not violate the equal protection clause.

**B. *Facial Challenge***

■ In the alternative, Plaintiffs argue that Section 10621's legislative history shows that the Statute was intended to "deprive [P]laintiffs and other opiate-dependent persons of effective health care in their community." (Pl. Mem. in Opp. to Def. Mot. for Sum. Jud. at 15.) As with their "as applied" challenge, Plaintiffs offer remarks—this time made by Pennsylvania legislators while debating Section 10621—showing a strong animus against drug addicts. (Pl. Mot. for Partial Sum. Jud. at 20; Pl. Mot. for Partial Sum. Jud. at Ex. 8 (Commonwealth of PA, Legislative Journal, May 3, 1999, House Bill 1335, PN 1582).) I again will assume for summary judgment purposes that these remarks could make out impermissible, discriminatory motivation. *See Bay Area Addiction Research & Treatment, Inc.*, 179 F.3d 725; *see also Innovative Health Sys.*, 117 F.3d 37. Once again, this does not entitle Plaintiffs to summary judgment, nor is it sufficient to defeat Defendant's summary judgment motion. Once again, the rational basis test I am obligated to apply is fatal to Plaintiffs' contentions. As the Supreme Court has explained:

Legislative classifications . . . are presumed to be constitutional, and the burden of showing a statute to be unconstitutional is on the challenging party, not on the party defending the statute: "those challenging the legislative judg-

ment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."

See *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 17, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), (*quoting Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). Accordingly, the Supreme Court has observed that "[a] facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the act would be valid." *See Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (isolated comments of state legislators cannot be used to infer legislative intent or purpose). Finally, in evaluating the constitutionality of a state law, I must be particularly sensitive to the concerns of federalism. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 44, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("[T]he maintenance of the principles of federalism is a foremost consideration" when courts examine the constitutionality of state laws and state action); *see also Georgevich v. Strauss*, 772 F.2d 1078, 1092 (3d Cir.1985).

■ Plaintiffs must show that no reasonably conceivable set of facts could provide "any rational support" for Pennsylvania requiring a public hearing before a municipality allows a methadone facility to operate within 500 feet of a residential area. *See N.Y. State Club Ass'n*, 487 U.S. at 17, 108 S.Ct. 2225, *citing United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *see also Heller*, 509 U.S. at 320, 113 S.Ct. 2637; *U.S. v. Pollard*, 326 F.3d 397, 408 (3d Cir.2003). Plaintiffs have not, and cannot, make this showing.

The Third Circuit has held repeatedly that because "land-use decisions are matters of local concern," they are best made by local decisionmakers who can balance competing interests. *See Lindquist v. Buckingham Twp.*, 106 Fed.Appx. 768, 773 (3d Cir.2004); *see also United Artists Theatre Circuit, Inc.*, 316 F.3d at 399–400. Section 10621 effectuates this aim by allowing the community to discuss publicly any proposed facility, and "following a public hearing, [and] a local vote, [to allow] the facility to go forward." (Pl. Mot. for Partial Sum. Jud. at Ex. 8 (Commonwealth of PA, Legislative Journal, May 3, 1999, House Bill 1335, PN 1582).) *See* 53 Pa. Cons.Stat. § 10621. To encourage public comment, the Statute does not restrict who may receive notice, who may address the municipality's governing body, or the location at which the governing body must hold its hearing. (Def. City of Reading's Opposition to Pl. Mot. for Partial Sum. Jud. at Section 41). Instead, by requiring public participation before a decision is made, Section 10621 ensures that the municipality understands the often conflicting interests attendant to so many zoning decisions. (Pl. Mot. for Partial Sum. Jud. at Ex. 8 (Commonwealth of PA, Legislative Journal, May 3, 1999, House Bill 1335, PN 1582).) The Statute thus allows treatment facilities to operate in a residential community while "ensuring that there will be local input, and a local decision made by the community." (Def. City of Reading's Opposition to Pl. Mot. for Partial Sum. Jud. at 5.)

Congress and state legislatures commonly include local participation requirements in land use statutes. *See, e.g.*, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47; 43 C.F.R. § 1610.2 (implementing NEPA);

Clean Air Act, 42 U.S.C. § 7410(a)(1); Pennsylvania General Municipal Law, Approval of Plats, 53 Pa. Con. Stat. § 10508(5); New Jersey Municipal Law, Waterfront Improvements, N.J. Stat. § 40:68–12. There has never been any suggestion that encouraging citizens to participate in the processes of their local government is irrational or inappropriate. On the contrary, federal courts have routinely enforced such local participation requirements. *See, e.g., La Vallee Northside Civic Asso. v. Virgin Islands Coastal Zone Management Com.*, 866 F.2d 616, 624 (3d Cir.1989) (enforcing public participation requirements under local environmental laws); *Klamath–Siskiyou Wildands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir.2004) (enforcing public participation requirements under NEPA).

Plaintiffs have not shown why Section 10621's local participation requirement is necessarily irrational. On the contrary, the undisputed facts show a conceivable rational basis for the requirement. Accordingly, Plaintiffs' challenge to the Statute's facial validity must fail as a matter of law.

### II: Procedural Due Process

Although Plaintiffs' Complaint appears to include a substantive due process claim, during oral argument Plaintiffs explained that they were raising only a procedural due process challenge to the City's denial of their zoning application. (N.T. March 24, 2005 at 45–46.)

■ To make out a procedural due process violation, Plaintiffs must establish that "[the City] deprived [them] of a protected property interest," and that "the state [has failed to] provide reasonable remedies to rectify a legal error by a local administrative body." *See Fred's Modern Contr., Inc. v. Horsham Twp.*, CIV. No. 02–0918, 2004 WL 620060, *3, 2004 U.S.

Dist. LEXIS 5490, *9–*10 (E.D.Pa. March 29, 2004) (internal citations omitted); *see also DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 596 (3d Cir.1991); *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 680 (3d Cir.1991); *Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir.1988); *Cohen v. Philadelphia*, 736 F.2d 81, 86 (3d Cir.1984). Thus, Section 10621 cannot violate Plaintiffs' procedural due process rights as long as the Commonwealth affords Plaintiffs a procedure by which to appeal the City's zoning decision. *See Bello* 840 F.2d at 1128 (procedural due process rights are satisfied if the state "affords a full judicial mechanism with which to challenge the administrative decision.").

Under 53 Pa. Cons.Stat § 11001–A, Plaintiffs could have appealed Council's denial of their zoning application to the Berks County Common Pleas Court. *See* 53 Pa. Cons.Stat § 11001–A *et seq.* Plaintiffs apparently acknowledge this. (Pl. Brief Addressing Issues Raised at Oral Argument at 7 ("The procedures for appeal are set out in 53 P.S. § 11001–A.").) In thus providing judicial review, the Commonwealth has protected Plaintiffs' due process rights. *DeBlasio*, 53 F.3d at 596.

### III. Section 504 of the Rehabilitation Act and Title II of the ADA

Plaintiffs next argue that the City violated the Rehabilitation Act and the ADA, and that these federal disability statutes preempt Section 10621. The City argues that NDTS lacks standing to bring these claims, that the individual Plaintiffs are disqualified from bringing their claims under the federal disability statutes, and that there is no federal preemption of Section 10621.

### A. Standing

■ The City contends that because Section 504 of the Rehabilitation Act and

Title II of the ADA cover only "qualified individuals," a public charity like NDTS lacks standing to sue under the statutes. *See* 29 U.S.C. § 705(20); 42 U.S.C. § 12131(2). The Third Circuit recently has held otherwise, however. *See Addiction Specialists, Inc. v. Twp. of Hampton,* 411 F.3d 399, 408 (3d Cir.2005) (holding that a proposed methadone treatment center has standing under both the ADA and the Rehabilitation Act).

The Third Circuit also has held that Title II of the ADA is to be read consistently with Title I, which allows associations with close ties to "disabled" persons to make claims. *See* H.R. Rep. No 485(III), at 51 (1990), *reprinted* in 1990 ISKCON 445, 474; *see also Kinney v. Yerusalim,* 9 F.3d 1067, 1073 n. 6 (3d Cir.1993). The Title II regulations provide that "a public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g) (2004); *see also Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 47–48 (2d Cir.1997). Thus, by its terms the ADA grants standing to "entities" like NDTS. The Third Circuit has directed courts to interpret the Rehabilitation Act and the ADA similarly. *See Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections,* 118 F.3d 168, 170 (3d Cir.1997) ("The law developed under Section 504 of the Rehabilitation Act is applicable to Title II of the Disability Act."), *aff'd,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

The Third Circuit has thus made it abundantly clear that entities like NDTS have standing to bring claims under Title II of the ADA and the Rehabilitation Act. *See Addiction Specialists, Inc. v. Town-* *ship of Hampton,* 411 F.3d 399, 408 (3rd Cir.2005).

## B. Violations of Section 504 and Title II

 The City next argues that the language of the Rehabilitation Act and the ADA bars the claims of the individual Plaintiffs. I agree.

To establish a violation of Section 504 of the Rehabilitation Act, Plaintiffs must prove that: (1) they are "handicapped individuals" under the Act; (2) they are "otherwise qualified" for the services sought; (3) they were denied from the services sought *"solely* by reason of [their] handicap"; and (4) the program or activity in question receives federal financial assistance. *See* 29 U.S.C. § 794(a) (2004) (emphasis added); *see also Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1009 (3d Cir., 1995); *Strathie v. Department of Transp.,* 716 F.2d 227 (3d Cir.1983); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991). To establish a violation of Title II of the ADA, Plaintiffs must show that they: (1) are qualified individuals with a disability; (2) were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; and (3) were excluded because of their disability. *See* 42 U.S.C. § 12131(2) (2004); *see also Wesley v. Vaughn,* CIV. Nos. 99–1228, 99–1229, 2003 WL 1493375, 2003 U.S. Dist. LEXIS 4434 (E.D.Pa. March 19, 2003); *Adelman v. Dunmire,* CIV. No. 95–4039, 1997 WL 164240, *1, 1997 U.S. Dist. LEXIS 3796, 1997 WL 164240, at *1 (E.D.Pa. Mar.28, 1997), *aff'd,* 149 F.3d 1163 (3d Cir.1998).

Under both the Rehabilitation Act and the ADA, drug addicts are considered "disabled" *only* if they are not "engaged in the illegal use of drugs" when the "covered

entity acts on the basis of [the plaintiffs' prior drug addiction]." *See* 29 U.S.C. § 705(20)(C)(I); 42 U.S.C. § 12114(a). Plaintiffs may not have used illegal drugs "recently enough so that continuing use is a real and ongoing problem." *See Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir.2001) (*quoting* H.R. Conf. Rep. No 101–596, at 62 (1990)). Thus, "refraining from illegal use of drugs is essential [to establishing a violation of either statute]." *See Brown v. Lucky Stores, Inc.*, 246 F.3d at 1188.

It is undisputed that five of the six individual Plaintiffs have "recently" used illegal drugs. (Def. City of Reading's Mot. for Sum. Jud at Ex. V, W, X, Y, Z (Requests for Admissions).) *See, e.g., Mascuilli v. U.S.*, 313 F.2d 764, 767 (3d Cir. 1963); FED. R. CIV. P. 36 (a party's failure to deny a request for admission will result in the matter being deemed admitted). Accordingly, these five individuals are not "disabled" under federal law.

 Even if I were to deem all the individual Plaintiffs "disabled," however, their claims could not proceed. Under the Rehabilitation Act, Plaintiffs must show that their identity as heroin addicts or methadone users was the *sole* reason for the City's decision. *See* 29 U.S.C. § 794(a); *see also Wagner*, 49 F.3d at 1009. Similarly, under the ADA, Plaintiffs must show that the reason for the denial of the permit was "by reason of their disability." *See* 42 U.S.C. § 12132; *see also Yeskey*, 118 F.3d at 170 ("The law developed under Section 504 of the Rehabilitation Act is applicable to Title II of the Disability Act."); *Helen L. v. DiDario*, 46 F.3d 325, 330 n. 7 (*citing Easley v. Snider*, 36 F.3d 297 (3d Cir.1994)); 28 C.F.R, § 35.103 ("This part [applying to the ADA] shall not be construed to apply a lesser standard than the standards applied under Title V

of the Rehabilitation Act of 1973 (29 U.S.C. 791)").

As I have already discussed, the undisputed evidence shows that the City based its denial of the NDTS application on a variety of reasons, including public safety, traffic, and loitering concerns. (Def. City of Reading's Mot. for Sum. Jud. at 27, 29). Indeed, Plaintiffs concede that the City's "refusal to grant a permit after the hearing was *in part* motivated by discrimination against methadone users." (Pl. Mot. for Sum. Jud. at 20 (emphasis added).) Thus, Plaintiffs apparently agree that they cannot show that the City based its zoning decision *solely* on Plaintiffs' drug use. *See Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir.1999); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) ("[S]ummary judgment is appropriate even in discrimination cases, [where the plaintiffs' arguments are] based on conclusory allegations of discrimination and the [defendant] provides a legitimate rationale for its conduct."); *see also Lewis v. University of Pittsburgh*, 725 F.2d 910, 918 (3d Cir. 1983).

Plaintiffs rely heavily on a Ninth Circuit's decision in *Bay Area Addiction Research & Treatment, Inc.*, 179 F.3d at 725. In that case, after a methadone treatment center received zoning approval to operate a facility in a residential area, the local municipality adopted an "urgency ordinance" retroactively banning all methadone facilities in residential neighborhoods. *See Bay Area Addiction Research & Treatment, Inc.*, 179 F.3d 725, 727–28 (9th Cir.1999). The Ninth Circuit ruled that the district court had applied an improper standard in refusing to enjoin enforcement of the ordinance under the ADA. *See id.* at 737. The Court never ruled, however, that the "urgency ordinance" actually violated the ADA. *See id.*

The instant case is readily distinguishable from *Bay Area Addiction Research & Treatment, Inc.* First, Section 10621 applies only to facilities established after the Statute's effective date of June 18, 1999. *See* 53 Pa. Stat. § 10621; 1999 Pa. Legis. Serv. 10, 1. More significantly, the Statute *allows* the zoning of methadone clinics in residential areas as long as a public hearing precedes any vote on the zoning decision. *See* 53 Pa. Stat. §§ 10621(a)(1),(b). Plainly, the Ninth Circuit's very narrow ruling is largely inapposite to Plaintiffs' challenge here.

In these circumstances, the undisputed facts establish that Plaintiffs cannot make out their claims under the ADA or the Rehabilitation Act.

### C. Preemption

 Finally, Plaintiffs argue that Section 504 of the Rehabilitation Act and Title II of the ADA preempt Section 10621. I disagree.

The Third Circuit has held that federal law preempts state law if: (1) a federal law expressly states that it preempts state regulation; (2) federal regulation is so comprehensive that "Congress left no room" for supplemental state regulation; or (3) federal and state law conflict. *See St. Thomas–St. John Hotel & Tourism Assoc. v. United States,* 357 F.3d 297, 302 (3d Cir.2004); *see also Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Rice v. Santa Fe Elevator Co.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Plaintiffs contend that express and conflict preemption apply here. (Pl. Supp. Brief on Issues Raised at Hearing at 4–6.)

 Express preemption exists when a federal statute explicitly supplants state regulation in a specified area. *See Gary v. Air Group, Inc.,* 397 F.3d 183, 186 (3d Cir.2005). There is nothing in either the Rehabilitation Act or the ADA that expressly prohibits states from enacting zoning or land use regulations. *Gary,* 397 F.3d at 186. On the contrary the ADA expressly provides it does not displace or bar local law:

> Nothing in this Act shall be construed to invalidate or limit the remedies, rights, and procedures of any federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this Act.

*See* 42 U.S.C. § 12201(b). The Rehabilitation Act does not include a provision explicitly allowing state and local regulation. Nonetheless, the Third Circuit has directed courts to interpret the Rehabilitation Act and the ADA similarly. *See Yeskey,* 118 F.3d at 170. It is, thus, clear that like the ADA, Section 504 does not expressly preempt state regulation and zoning for methadone treatment centers.

In these circumstances, federal law does not expressly preempt Section 10621. *See Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 125 S.Ct. 1788, 1801, 161 L.Ed.2d 687 (*citing Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ("[Courts must] start with the presumption that the historic powers of the States were not to be superceded by [federal law] unless that was the clear and manifest purpose of Congress.").)

 Conflict preemption arises only when it is impossible to comply with both federal and state law, or the state law is an obstacle to executing the purposes of the federal law. *See C.E.R.1988, Inc. v. Aetna Casualty & Surety Co.,* 386 F.3d, 263 (3d Cir.2004) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135

700 (1996)). "Because the States are independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly preempt state law causes of action." *C.E.R.*, 386 F.3d at 269. Additionally, courts are reluctant to find preemption in areas falling within the state's traditional police powers; rather courts prefer to reconcile "the operation of both statutory schemes ... rather than hold one completely ousted." *See Ford Motor Co. v. Insurance Commissioner*, 874 F.2d, 926, 936 (3d Cir.1989), *quoting Merrill Lynch v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973).

Here, Section 10621—a zoning and land use statute—certainly falls within the Commonwealth's traditional police powers. *See United Artists Theatre Circuit, Inc.*, 316 F.3d at 399–400 (zoning and land use laws fall within traditional state police powers); *see also Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1030 (3d Cir.1987). Further, Section 10621 can be reconciled with the Rehabilitation Act and the ADA. As I have already discussed, the Statute is one that ensures public participation before a municipality approves zoning for a methadone treatment center in a residential neighborhood. In thus requiring the municipality to consider the opinions of its residents, Section 10621 is not an impermissible "obstacle" to effectuating the ADA or the Rehabilitation Act.

## CONCLUSION

In sum, the undisputed facts necessarily show that Plaintiffs cannot prevail in this case. Accordingly, I grant Defendant's Summary Judgment Motion, deny Plaintiffs' Summary Judgment Motion, and dismiss.

An appropriate order follows.

## ORDER

**AND NOW**, this 19th day of August, 2005, upon consideration of Plaintiffs' Motion for Partial Summary Judgment, Defendant's Response, and any related submissions, it is **ORDERED** that the Motion is **DENIED**.

**IT IS FURTHER ORDERED** that upon consideration of Defendant's Motion for Summary Judgment, Plaintiffs' Response, and any related submissions, the Motion is **GRANTED**.

The Clerk shall mark this case closed for statistical purposes.

## CIVIL JUDGMENT

**AND NOW**, this 19th day of August, 2005, in accordance with Rule 58 of the Federal Rules of Civil Procedure, **IT IS ORDERED** that Judgment is entered in favor of Defendant and against Plaintiffs.